Filed 4/2/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MICHAEL BOCK et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CRAIG HANSEN, <br><br> Defendant and Respondent. | A136567 <br><br> (Napa County <br> Super. Ct. No. 2657438) |

A 41-foot long, 7,300 pound tree limb crashed onto the home of appellants Michael and Lorie Bock, an incident they reported to their homeowner's insurer, Travelers Property and Casualty Insurance Company (Travelers). Travelers assigned respondent Craig Hansen to adjust the loss, whose behavior, as alleged by the Bocks, can best be described as appalling. On Hansen's first visit to the scene (which lasted no more than 15 minutes), he altered the scene before taking pictures, spoke derogatorily to Mr. Bock, and misrepresented the policy coverage, causing the Bocks to begin the clean up themselves, in the course of which Mrs. Bock was injured. Travelers refused the Bocks' request to replace Hansen, who in the course of adjusting the loss is alleged to have revised an estimate to include a false statement by the Bocks, conspired with an unlicensed contractor to create a false report, and engaged in various other misconduct.

The Bocks sued Travelers and Hansen, their claims against Hansen alleging negligent misrepresentation and intentional infliction of emotional distress. The trial court sustained Hansen's demurrer without leave to amend, concluding that the Bocks "have presented no convincing argument for allowing these claims to stand against defendant Hansen in what is a contract based action." We conclude otherwise and reverse, holding first that negligent misrepresentation can be asserted against an

1

insurance adjuster, and that such claim was adequately pleaded here. We also hold that the intentional infliction of emotional distress claim was not adequately pleaded, but that the trial court abused its discretion in denying leave to amend.[1]

## BACKGROUND

### The Facts

The facts for our analysis are those alleged by the Bocks, all of which are admitted by Hansen's demurrer (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967), as are any facts that may be implied or inferred from those expressly alleged. (*Traders Sports, Inc. v. City of San Leandro* (2001) 93 Cal.App.4th 37, 43.) Those facts must be accepted no matter how unlikely or improbable (*Del E. Webb Corp. v. Structured Materials Co.* (1981) 123 Cal.App.3d 593, 604), and without regard to the Bocks' ability to prove them. (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 213-214.) Those facts are these:

In December 2001, the Bocks purchased from Travelers a homeowner's policy covering their home in the city of Angwin, Napa County. The policy covered certain risks of physical loss to their home and provided additional coverage for debris removal.

Early on the morning of September 9, 2010, a large limb—41 feet long, some two feet in diameter, and weighing 7,300 pounds—broke off from an oak tree in the Bocks' front yard, "crashing into the chimney, the front of the house, and through the living room window." The giant limb caused three other large limbs to fall, which came to rest on a portion of the Bocks' chimney. The limbs "caused significant damage to the Bocks' chimney, which had been in working condition prior to the incident and was used as the

---

[1] This case was argued on January 22, 2014, and submitted that day. Today, April 2, 2014, the day the opinion is filed, the clerk's office received a letter from counsel advising that the parties have settled and enclosing a stipulation for dismissal of the appeal. We do not have to accept such stipulation. (See Cal. Rules of Court, rule 8.244(c)(2).) And we do not, especially in light of the issues presented. (*Bay Guardian Co. v. New Times Media, LLC* (2010) 187 Cal.App.4th 438, 445, fn. 2; *Castro v. Superior Court* (2004) 116 Cal.App.4th 1010, 1014, fn. 3; *DVD Copy Control Assn., Inc. v. Bunner* (2004) 116 Cal.App.4th 241, 245, fn. 2.)

2

Bocks' primary heating source for their home." The limbs also broke three windows and caused damage to the interior of the home, the Bocks' fence, and Mrs. Bock's car.

The Bocks reported the incident to Travelers that same day. Travelers did not send an adjuster to the scene until the following day, September 10, when Hansen arrived. Upon arrival, Hansen told Mrs. Bock that he only had a few minutes to review the damage, and in fact spent no more than ten to fifteen minutes at their home. Before Hansen took any pictures of the damage, he pushed several branches out of the living room window. When Mrs. Bock asked Hansen why he had not taken the pictures first, he ignored her, telling her to "clean up the mess," and demanding she clean up the living room. Moving outside, Hansen also removed the limbs leaning against the chimney and the fence before taking any pictures, all the while making derogatory comments about PG&E, Mr. Bock's employer, which Mrs. Bock found rude and upsetting.

Before leaving, Hansen wrote a check for $675.69. When Mrs. Bock said that the amount would not be enough to even clean up, let alone repair, the damage, Hansen told her that cleanup was not covered under the policy and that she should contact "friends and family members with chainsaws" to clean up the limbs and the mess in the house and backyard. Relying on these statements, Mrs. Bock attempted to clean up the broken glass, sustaining a cut on her hand.

After Hansen left, Mr. Bock discovered that the fallen limbs had caused significant damage to the chimney. The next day, September 11, Mrs. Bock sent an email to Travelers Property Field Manager Frank Blaha, reporting the chimney damage. She also requested that another adjuster be assigned to their claim because Hansen was "rude, disinterested, and rushed during his initial visit."

Travelers ignored the request, and Hansen prepared an estimate, which Blaha sent to the Bocks on September 13. The estimate, which totaled $3,479.54 , reflected minimal amounts for each category of repairs needed, and was unreasonably low, as the Bocks had obtained an estimate the same day in the amount of $2,065 for cut up and removal of the tree limbs alone.

On September 15, Hansen again came to the house, this time accompanied by Blaha. The Bocks were present, as was Ron Priest, a licensed general contractor who was there at the Bocks' request. Hansen and Blaha were shown the significant cracks in the chimney, as well as gouges where the limbs had hit it, and Hansen took pictures of the damage to the chimney. Again, Hansen falsely told the Bocks that their policy did not cover the cost of clean up, explaining, "If a car had hit the tree causing it to fall, then the clean-up would be covered but since the wind caused the limb to fall, the cost to clean up the limbs was not covered." Hansen told Mr. Bock to get his chainsaw and remove the limbs himself, and as he did so, Hansen yelled, "Atta boy! See you can do it! Now go get a few friends to finish it up."

On September 17, Travelers provided the Bocks with a revised estimate for the loss. While the revised estimate increased the amount payable to $3,655.23, it eliminated amounts previously included for damage to the hardwood floor and fence, based on the false statement that the Bocks had confirmed during the reinspection that there was no damage to those items, despite obvious physical evidence to the contrary.

That same day, acting at the request of Travelers, Roy Anderson of Vertex Construction Services (Vertex) inspected the Bocks' house. Neither Vertex nor Anderson had a valid California contractor's license. Because the limbs and debris had already been removed, Mrs. Bock provided Anderson a disk containing digital images that showed the fallen limbs and damage on the morning of the accident. Anderson sent Hansen a report dated September 29, detailing the results of his inspection and which concluded—falsely, the Bocks alleged—that "[n]o scarring, gouging, or scuff marks were noted on the siding or trim materials on the northeast corner of the residence." Anderson's report also falsely stated that "[t]here was no visual evidence that the fallen tree branch impacted the chimney, or that the fallen tree branch . . . propagated any damage to the natural rock chimney," instead concluding that the "fireplace appear[ed] to be in good and serviceable condition." Finally, Anderson's report concluded that the observed cracks in the chimney were minor and were "due to the age of the chimney and the residence," and that inspection of the interior and exterior of the house revealed that

4

"[t]he only damage . . . due to the fallen tree branch [was] the broken window and frame."  Hansen did not perform any tests to support his conclusion, and did not include in his report any statements from the Bocks or Priest.

By letter dated October 1, Hansen informed the Bocks that based on the Vertex report Travelers was denying coverage for the chimney damage.

The Bocks asked Priest, a licensed contractor, to review the Vertex report and provide a response.  He did, preparing a report disputing the false statements contained in the Vertex report and describing how the tree limb damaged the chimney, a conclusion he reached having inspected the property three times.  On January 14, 2011, the Bocks, through their attorney, submitted additional information to Travelers, including Priest's report, and requested that Travelers reconsider its coverage determination.  Travelers never responded.

**The Proceedings Below**

The Bocks filed a complaint naming Travelers, Hansen, and Vertex.  The complaint asserted six causes of action, including five against Travelers, styled as follows:  first, breach of contract; second, breach of the implied covenant of good faith and fair dealing (bad faith); third, intentional misrepresentation (false promise with no intent to perform); fourth, intentional misrepresentation (false statement); and sixth, violation of Business and Professions Code section 17200 et seq.  The fourth cause of action, for intentional misrepresentation, was also alleged against Hansen.  Two causes of action, the fifth, for intentional interference with contract, and the sixth, were alleged against Vertex.[2]

Travelers demurred to the third, fourth, and sixth causes of action on the ground that each failed to state a claim.  Travelers also filed a motion to strike all allegations that it acted with malice, oppression, and fraud, and all requests for punitive damages and attorney fees.  As to the third cause of action, promise without intent to perform,

---

[2] Vertex answered the original complaint, as well as the first amended complaint , and its involvement is not pertinent to the issues before us.

5

Travelers argued that the complaint failed to allege any facts demonstrating that Travelers never intended to perform under the terms of the policy at the time it was issued to the Bocks. As to the fourth cause of action, false statement, Travelers argued that the complaint failed to allege the specificity required of a fraud claim, and was an improper attempt by the Bocks to turn a contract dispute into a fraud claim. And as to the sixth cause of action, violation of Business and Professions Code section 17200, Travelers argued that the Bocks failed to identify a California law that Travelers allegedly violated and failed to allege conduct that was unfair or fraudulent, since a section 17200 claim cannot be based on mere claims mishandling.

**The First Amended Complaint**

Before Travelers' demurrer came on for hearing, the Bocks filed a first amended complaint (FAC). They withdrew their claim for intentional misrepresentation based on a false statement, but added claims for negligent misrepresentation (fourth cause of action) and intentional infliction of emotional distress (a new fifth cause of action). Both claims were alleged against Travelers and Hansen, and are the causes of action involved in this appeal.

The fourth cause of action, negligent misrepresentation, alleged that Hansen falsely told the Bocks that their policy did not cover the cost of clean up; that Hansen either knew the representations were false when he made them, or he made them with reckless disregard of their truth; and that the Bocks relied on Hansen's false statements and performed the cleanup on their own, to their detriment.

The fifth cause of action, intentional infliction of emotional distress, alleged that the actions of both Travelers and Hansen were extreme and outrageous and were known by them to be substantially certain to cause the Bocks significant distress. In support of this allegation, the Bocks asserted that defendants abused their position of power over them to falsely induce them to perform the cleanup; purposely ignored information demonstrating coverage when they denied the claim; and withheld information from Vertex when the chimney was inspected—all to "justify [defendants'] predetermined course of denying payments justly due to [the Bocks] under the policy."

6

Travelers again demurred to all causes of action except for the breach of contract and bad faith claims. Travelers' fundamental argument was that the causes of action were all premised on Travelers' alleged mishandling of a claim, and was in essence a dispute properly asserted only as claims for breach of contract and bad faith. Travelers also filed another motion to strike, again seeking to strike all allegations of malice, oppression, and fraud, and all requests for punitive damages and attorney fees.

Following the Bocks' opposition, and Travelers' reply, the demurrer and motion to strike came on for hearing on March 13, 2012. Ten days later, the court issued its brief, four-paragraph ruling, sustaining the demurrer without leave to amend. The substance of the order reads in its entirety is as follows:

"Defendant's demurrer to the causes of action for intentional and negligent misrepresentation, intentional infliction of emotional distress and unfair business practices is SUSTAINED, without leave to amend.

"It is clear from the allegations, and from the arguments made in plaintiffs' opposition, that this action is strictly contract based. None of the facts alleged in the [First Amended Complaint] support a fraud based claim, and plaintiffs have not suggested any facts they could allege that would support a misrepresentation claim or a claim for intentional infliction of emotional distress. Because none of these causes of action are [sic] supported, there is also no basis to include a claim for unfair business practices.

"The court notes that plaintiffs previously amended their complaint in response to a demurrer raising these same arguments as to fraud claims in the original complaint. Because plaintiffs have not successfully cured the defects noted in that earlier demurrer, and have not set forth facts and argument suggesting that the defects can be cured, the court will sustain the demurrer to the subject causes of action without leave to amend."

The court also granted Travelers' motion to strike, again without leave to amend, explaining in full as follows: "Defendant's motion to strike plaintiffs' claims for punitive damages and for private attorney general attorney's fees is GRANTED, without leave to amend. As noted above, the court sustains without leave to amend all causes of action

7

upon which plaintiffs' claims for punitive damages and attorney's fees rest. The FAC simply contains no allegations to support these claims, and the court finds no basis for allowing leave to file a second amended complaint."[3]

The court ordered Travelers to answer the remaining causes of action within ten days, which it did.

The next month, Hansen filed his own demurrer to the two causes of action against him, negligent misrepresentation and intentional infliction of emotional distress. As to the claim for negligent misrepresentation, Hansen argued that the claim failed for four reasons: (1) the Bocks failed to show that Hansen owed them an actionable legal duty; (2) the Bocks were simply trying to reconstitute their breach of contract claim against Travelers as a negligent misrepresentation claim against him; (3) the Bocks had constructive knowledge of their policy and thus could not justifiably rely on Hansen's statement; and (4) the documents attached to the first amended complaint showed that Travelers did actually pay for debris removal. As to the claim for intentional infliction of emotional distress, Hansen argued that the Bocks failed to allege extreme and outrageous conduct, and that a mere denial of benefits is insufficient to support a claim of infliction of emotional distress.

The Bocks filed opposition. As to the cause of action for negligent misrepresentation, the Bocks argued that, while case law may hold that an adjuster cannot be held liable for breach of contract or bad faith, such authority is "wholly irrelevant to whether [Hansen] can be held liable for his own deceit." The Bocks also disputed Hansen's claim that Travelers paid all cleanup and removal costs.

As to the emotional distress claim, the Bocks argued that Hansen ignored overwhelming evidence that the tree limb hit and cracked the chimney; insulted and

---

[3] While the issue of punitive damages is not before us, we find the trial court's ruling on the motion to strike curious, as punitive damages may be available when an insured prevails on a tort claim for breach of the implied covenant of good faith and fair dealing. (*Blue Shield of California Life & Health Ins. Co. v. Superior Court* (2011) 192 Cal.App.4th 727, 730, fn. 1.)

disparaged them; altered the scene of the accident before taking photographs; misrepresented the terms of the policy; prepared false claim reports; conspired with Vertex to prepare an intentionally false report; and knowingly relied on the false report in order to deny a legitimate claim. Finally, the Bocks requested leave to amend if the court determined that the first amended complaint lacked specificity.

Hansen filed a reply, noting that the Bocks completely ignored the court's prior ruling dismissing these same causes of action against Travelers. In addition to disputing the merits of the Bocks' arguments, Hansen urged the court to sustain the demurrer without leave to amend because the Bocks had not demonstrated how they could amend the complaint to cure its deficiencies.

The court heard argument on Hansen's demurrer, at the conclusion of which it took the matter under submission.[4] The following week, the court issued a two-paragraph order, the one substantive paragraph of which reads in its entirety as follows:

"Defendant Hansen's demurrer to the FAC is sustained, without leave to amend. In sustaining co-defendant Travelers' demurrer, this court previously ruled that plaintiff's complaint does not, and cannot, state causes of action for negligent misrepresentation and intentional infliction of emotional distress. The court recognizes that this demurrer is brought by a different defendant, but plaintiffs have presented no convincing argument for allowing these claims to stand against defendant Hansen in what is a contract based action."

Hansen moved for dismissal of the first amended complaint and requested judgment in his favor. The court granted the motion, and entered judgment for Hansen. This timely appeal followed.

## DISCUSSION

### Standard of Review

Our standard of review is de novo, as we exercise our independent judgment to determine whether the complaint states a cause of action as a matter of law. (*Traders*

---

[4] The transcript of the hearing is not in the record before us.

9

*Sports, supra,* 93 Cal.App.4th at p. 43.)  We give the complaint a reasonable interpretation, reading it as a whole and viewing its parts in context.  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

**Negligent Misrepresentation Can Lie Against an Insurance Adjuster, and Such a Claim Was Pleaded Here**

As noted, the trial court held that a negligent misrepresentation claim cannot lie against an insurance adjuster as a matter of law, adopting the argument made by Hansen below.  Hansen makes the same argument here, beginning his brief with the fundamental argument that he cannot be held personally liable for negligent misrepresentation "based on conduct that occurred while adjusting a claim because, as a matter of law, he does not owe plaintiffs a legal duty."  Or, as Hansen succinctly puts it later, "Courts have held that agents and employees of insurance companies do not owe a duty to the insured; instead, any liability for their actions lies on the insurer so long as the agency was disclosed to the insured and the conduct took place within the course and scope of such agency.  (*Sanchez v. Lindsey Morden Claims Services, Inc.* (1999) 72 Cal.App.4th 249, 253 (*Sanchez*); *Lippert v. Bailey* (1966) 241 Cal.App.2d 376, 382.)"  We are not persuaded, certainly not by the two cases cited.

*Lippert* involved insurance agents who were involved in the initial procurement of the insurance policy, not an adjuster involved in adjusting a loss.  It has nothing to do with the circumstances here.  And *Sanchez* is distinguishable.

*Sanchez, supra,* 72 Cal.App.4th 249, arose in the context of a cargo insurance policy issued to Sanchez, a mover.  Some property he was moving for a customer was damaged during a move, and Sanchez made a claim on the policy for repair of that property, which Sanchez said would cost $12,000 and take a week.  The insurer retained defendant Lindsey Morden Claims Services (Lindsey), an independent adjuster, to investigate and adjust the loss.  Sanchez advised Lindsey that immediate repairs were required because the purchaser of the property was suffering business losses.  Sanchez's advice went unheeded, and three months passed before the claim was paid and the repairs

10

completed. As a result the customer sued Sanchez, and obtained a judgment against him for $1,325,000. (*Id.* at p. 251.)

Sanchez sued the insurer for breach of the insurance policy and also sued the adjuster on a negligence theory. The adjuster demurred, arguing it had no contract with Sanchez and owed him no duty of care. The trial court sustained the demurrer without leave to amend, and the Court of Appeal affirmed, following a six-page analysis of why no duty of care was owed that would support a claim for negligence. (*Sanchez, supra,* 72 Cal.App.4th at pp. 250–255.)[5]

*Sanchez* is inapplicable here. The Bocks do not allege negligence. They allege negligent misrepresentation. They are different torts, as the Supreme Court expressly observed in *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 407: "[N]either the courts (ourselves included), the commentators, nor the authors of the Restatement Second of Torts have made clear or careful distinctions between the tort of negligence and the separate tort of negligent misrepresentation. The distinction is important not only because of the different statutory bases of the two torts, but also because it has practical implications for the trial of cases in complex areas . . . . [¶] Negligent misrepresentation is a separate and distinct tort, a species of the tort of deceit." In short, the elements of each tort are different. Perhaps more importantly, the policies behind each tort sometimes call for different results even when applied to the same conduct. (*Id.* at pp. 396–397, 406-407, 412–413.)

It is beyond dispute that, in addition to breach of contract, various tort theories are available to insureds against their insurers. The most prominent, of course, is bad faith. There are others as well, as the leading California treatise points out: "When supported by appropriate facts, an insurer's mishandling of a claim . . . may also be actionable under one or more of the following alternative tort theories: [¶] . . . [¶] Negligent Misrepresentation." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The

---

[5] In the course of its lengthy exposition, *Sanchez* observed that "indeed, negligence is not among the theories of recovery generally available against *insurers*." (*Sanchez, supra,* 72 Cal.App.4th at p. 254.)

11

Rutter Group 2013) ¶ 11:9, p. 11-3 (Croskey).)  And the treatise goes on to state, in point blank terms:  "The insurer's agents and employees may have committed some independent tort in the course of handling the third party claims; e.g., *misrepresentation or deceit*, invasion of privacy, intentional infliction of emotional distress, etc.  In such event, they can be held personally liable, even though not parties to the insurance contract.  (See *Doctors' Co. v. Sup. Ct. (Valencia)*[(1989) 49 Cal.3d 39,] 47; *Gruenberg v. Aetna Ins. Co.*[(1973) 9 Cal.3d 566, 576]; and *Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498, 511 [(*Younan*)].)"  (Croskey, *supra*, ¶ 12:104, p. 12A-36, italics added.)

Witkin is similar:  "Tort recovery for improper claims practices may be based on more intentional torts than breach of the implied covenant . . . . These include the following:  [¶] . . . [¶] (2) *Negligent Misrepresentation.*"  (2 Witkin, Summary of Cal. Law (10th ed. 2005) Insurance, § 251, p. 371.)  This law is well grounded in policy.

As quoted above, Hansen's fundamental position, based on *Sanchez*, is that he owed no duty to the Bocks.  It is true that, as in negligence, "responsibility for negligent misrepresentation rests upon the existence of a legal duty, imposed by contract, statute or otherwise, owed by a defendant to the injured person.  The determination of whether a duty exists is primarily a question of law."  (*Eddy v. Sharp* (1988) 199 Cal.App.3d 858, 864.)  We answer that question of law against Hansen, and easily find such duty here.

In *Vu v. Prudential Property & Casualty Ins. Co.* (2001) 26 Cal.4th 1142, the Supreme Court recognized that while the relationship between the insurer and insured is not a true fiduciary one, it is nevertheless "special," citing and quoting from cases that have used various terms to describe that relationship:  "[L]ater cases have built upon this premise and declared that an insurer and its insured have a 'special relationship' [citations].  Under this special relationship, an insurer's obligations are greater than those of a party to an ordinary commercial contract.  [Citation.]  In particular, an insurer is required to 'give at least as much consideration to the welfare of its insured as it gives to its own interests.'  [Citation.]  Cases have referred to the relationship between insurer and insured as a limited fiduciary relationship [citation]; as 'akin to a fiduciary relationship'

12

[citation]; or as one involving the 'qualities of decency and humanity inherent in the responsibility of a fiduciary' [citation]. [¶] The insurer-insured relationship, however, is not a true 'fiduciary relationship' in the same sense as the relationship between trustee and beneficiary, or attorney and client. [Citation.] It is, rather, a relationship often characterized by unequal bargaining power [citation] in which the insured must depend on the good faith and performance of the insurer [citations]. This characteristic has led the courts to impose 'special and heightened' duties, but '[w]hile these "special" duties are akin to, and often resemble, duties which are also owed by fiduciaries, the fiduciary-like duties arise because of the unique nature of the insurance contract, *not* because the insurer *is* a fiduciary.' " (*Id.* at pp. 1150–1151.)

Such special relationship leads to the conclusion that Hansen, the employee of the party in the special relationship, had a duty to the Bocks. Likewise, the general law of negligent misrepresentation.

It is generally said that "California courts have recognized a cause of action for negligent misrepresentation, i.e., a duty to communicate accurate information, in two circumstances. The first situation arises where providing false information poses a risk of and results in physical harm to person or property. The second situation arises where information is conveyed in a commercial setting for a business purpose." (*Friedman v. Merck & Co.* (2003) 107 Cal.App.4th 454, 477.) The setting here involves both: Mrs. Bock was injured as a result of Hansen's misrepresentation. And Hansen said what he said for a business purpose.

Hansen attempts to diminish the extent of Ms. Bock's injury, deeming it this nothing but an "incidental injury [that] does not render the negligent misrepresentation claim actionable." We find the potential consequences of such assertion dangerous. Perhaps Mrs. Bock's injury was merely an "incidental injury." Perhaps not. But if it were, Hansen should consider himself lucky. It is not difficult to imagine Mr. Bock, being told that the cleanup of a 3.6 ton tree limb is dependent upon his own resourcefulness and hard work, standing on his roof with a chainsaw in order to clean up the mess, and accidentally falling, sustaining serious injuries—injuries that might not be

13

recoverable in an action on the policy or the bad faith claim. (See *Richards v. Sequoia Ins. Co.* (2011) 195 Cal.App.4th 431, 438 [to prevail in tort action for breach of covenant of good faith and fair dealing, insured must show proof of economic loss; action is one seeking recovery of property right, not for personal injury].)

In any event, the fact is that the Bocks have alleged that Mrs. Bock sustained a cut on her hand as a result of cleaning up the glass and debris as instructed by Hansen. This is actionable. (See Rest.2d Torts, § 311: one "who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information.")

Hansen also argues that he cannot be liable as an agent because he was acting in the course and scope of his employment. The complete answer is found in the terse statement of the rule in Witkin: "An agent or employee is always liable for his or her own torts, whether the principal is liable or not, and in spite of the fact that the agent acts in accordance with the principal's directions. [Citations.] [¶] Similarly, an agent who commits an independent tort, such as fraud, remains liable despite the fact that the principal, by ratification, also becomes liable." (3 Witkin, Summary of Cal. Law, *supra,* Agency & Employment, § 199, p. 252.)

Hansen cites three federal cases, two published, one not, which he cites for the proposition that insurance adjusters can never be liable for negligent misrepresentation claims if the false statement was made in the course of the adjuster's employment: *Good v. Prudential Ins. Co. of America* (N.D. Cal. 1998) 5 F.Supp.2d 804; *Icasiano v. Allstate Ins. Co.* (N.D. Cal. 2000) 103 F.Supp.2d 1187, 1190; and *Moreno v. Allstate Ins. Co.* (C.D. Cal. Sep. 10, 2002, Civ. No. S02-1426) 2002 WL 31133203. We find *Good* distinguishable and *Icasiano* and *Moreno* unpersuasive. *Good* involved an insurance agent who made representations about the benefits of an increased variable life insurance policy, not an adjuster. As to *Icasiano*, the entire "analysis" of the issue was this: "An agent of an insurance company is generally immune from suits brought by claimants for actions taken while the agent was acting within the scope of its agency. (See *Lippert v. Bailey* (1966) 241 Cal.App.2d 376, 382; *Gasnik v. State Farm Ins. Co.* (E.D. Cal. 1992)

14

825 F.Supp. 245, 249; *Good, supra,* 5 F.Supp.2d at p. 807.) In such cases, the cause of action lies against the insurance company and not its agent. (See *Lippert, supra,* 241 Cal.App.2d at pp. 383–384.)" (*Icasiano, supra,* 103 F.Supp.2d at p. 1189–1190.) And *Moreno* did nothing more than follow *Icasiano*.

In sum, we hold that a cause of action for negligent misrepresentation can lie against an insurance adjuster. We also hold that one was adequately alleged here.

"The elements of negligent misrepresentation are (1) a misrepresentation of a past or existing material fact, (2) made without reasonable ground for believing it to be true, (3) made with the intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." (*Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 196; CACI 1903.) The Bocks adequately alleged such claim here, that: Hansen falsely told the Bocks that their policy did not cover the cost of clean up; Hansen either knew the representation was false when he made it, or he made it with reckless disregard of their truth; and the Bocks relied on Hansen's false statements to their detriment.

Hansen makes two other arguments, essentially fact-based, as to why the Bocks cannot state a claim for negligent misrepresentation. Neither has merit. The first asserts that the Bocks did not justifiably rely on Hansen's misrepresentation. In Hansen's words: "[The Bocks'] reliance was unjustified as a matter of law. An insured cannot justifiably rely on an adjuster's representations about coverage when they contradict the express terms of the policy"; and, he goes on, "[h]ad [the Bocks] read the policy . . . they would have seen that Hansen's alleged statements clearly were incorrect." We are nonplussed: not only does Hansen acknowledge his "clearly" erroneous statement to the Bocks, but he then faults them for believing him. In any event, the argument has no merit.

Over 100 years ago our Supreme Court observed that " 'It is a matter almost of common knowledge that a very small percentage of policy-holders are actually cognizant of the provisions of their policies . . . . The policies are prepared by the experts of the companies, they are highly technical in their phraseology, they are complicated and voluminous . . . and in their numerous conditions and stipulations furnishing what

15

sometimes may be veritable traps for the unwary. . . . [¶] The courts, while zealous to uphold legal contracts, should not sacrifice the spirit to the letter nor should they be slow to aid the confiding and innocent." (*Raulet v. Northwestern etc. Ins. Co.* (1910) 157 Cal. 213, 230.) As the court put it in *Clement v. Smith* (1993) 16 Cal.App.4th 39, 49, albeit in the setting of a claim against an originating insurance agent, "When dealing with a contract as adhesive as the typical insurance policy, we are unwilling to impose on the insured so onerous a burden as would automatically defeat any agent's liability for misrepresentation. Certainly an insured cannot remain intentionally ignorant of the terms of his or her policy. . . . Absent some notice or warning, an insured should be able to rely on an agent's representations of coverage without independently verifying the accuracy of those representations by examining the relevant policy provisions." (Accord, *Eddy v. Sharp, supra,* 199 Cal.App.3d at p. 864 [" ' "[it] is a matter almost of common knowledge that a very small percentage of policy-holders are actually cognizant of the provisions of their policies . . . ." ' "].)

Hansen's other fact-based argument asserts that the Bocks did not rely, and did not "sustain any damage as a result of the representation," as they had notice when they received their first estimate, which included a minimal amount for debris cleanup, that the policy provided coverage. This argument ignores the fact that the Bocks immediately relied upon Hansen's statement before an estimate was ever received, the allegation being that the Bocks began cleaning up the debris while Hansen was still present. Moreover, the fact that Travelers paid *some* of the cleanup costs does not mean that the Bocks did not sustain any damages. Indeed, they expressly alleged that they submitted an estimate of $2,065 for removal of the limbs, and that Travelers paid only a fraction of the total cost. And, of course, the Bocks' own time and effort in the clean up has value.

The negligent misrepresentation claim against Hansen may proceed.

16

**Intentional Infliction of Emotional Distress Can Lie Against an Insurance Adjuster, But Such Claim Was Not Adequately Pleaded Here**

As quoted above, the trial court held that the Bocks "presented no convincing argument for allowing these claims to stand against defendant Hansen in what is a contract based action," apparently holding that such claim failed as a matter of law. Hansen does not make such argument here, understandably, as the law is otherwise. (See, for example, *Hailey v California Physicians' Service* (2007) 158 Cal.App.4th 452, 473-476; *Hernandez v. General Adjustment Bureau* (1988) 199 Cal.App.3d 999, 1007; *Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 385, 408 [claims supervisor].) Rather, Hansen's position is that the Bocks did not allege, and cannot amend their complaint to allege, the requisite outrageous conduct. We agree with Hansen's first statement. But find the second statement premature.

The law was confirmed in *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050–1051 (*Pair*), where, affirming a summary judgment for defendants, the Supreme Court observed as follows:

"A cause of action for intentional infliction of emotional distress exists when there is ' " ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." ' " ' A defendant's conduct is 'outrageous' when it is so ' " 'extreme as to exceed all bounds of that usually tolerated in a civilized community.' " ' And the defendant's conduct must be ' " 'intended to inflict injury or engaged in with the realization that injury will result.' " ' [Citation.]

"Liability for intentional infliction of emotional distress ' "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." [Citation.]' [Citations.]

"With respect to the requirement that a plaintiff show severe emotional distress, this court has set a high bar. 'Severe emotional distress means " 'emotional distress of

17

such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.' " ' " (To the same effect, see *Schlauch v. Hartford Acc. & Indem. Co.* (1983) 146 Cal.App.3d 926, 936 [conduct must be " ' "so extreme as to exceed all bounds of that usually tolerated in a civilized community" ' "]; and CACI 1602 [conduct must go beyond mere insults, indignities, threats, hurt feelings or bad manners that a reasonable person is expected to endure].)

The Bocks assert there are numerous ways outrageous conduct may be demonstrated, including, for example, " ' "if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress." '[Citations.]" (*Hailey v. California Physicians' Service, supra,* 158 Cal.App.4th 454 at p. 474.) We generally agree. But whether such a claim measures up is the question. And referring to this, Croskey notes that "[w]hether particular conduct is 'outrageous' can best be determined in light of holdings in earlier cases dealing with particular types of conduct. (*Soto v. Royal Globe Ins. Co.* (1986) 184 Cal.App.3d 420, 430.)" (Croskey, *supra*, § 11:69, p. 11-22.)

Seemingly recognizing this, the Bocks contend their allegations "are similar to the allegations that were made in *Younan*[*, supra,*] 111 Cal.App.3d 498, and *Little v. Stuyvesant Life Ins. Co.* [(1977)] 67 Cal.App.3d 451."

In *Younan, supra,* 111 Cal.App.3d 498, the Court of Appeal held that the insured sufficiently pled outrageous conduct where he alleged that his disability insurer required him to take a medical examination, but instead of sending him to a medical doctor, sent him to several psychological clinicians, one of whom omitted the results of certain tests in his report. (*Id.* at pp. 503–505.) After receiving the false report, the insurer denied the insured's claim for disability benefits (*id.* at p. 506), which denial occurred at a time when he was unable to earn a living to support himself and his family. (*Id.* at p. 504.)

In *Little, supra,* 67 Cal.App.3d 451, 461–462—which was not a pleading case but followed a jury verdict for the insured—the Court of Appeal found outrageous conduct

18

when the defendant disability insurer "purposely ignored the great bulk of the medical information it had and withheld that information . . . to justify its predetermined course of discontinuing disability benefit payments justly due" under the insured's policy. Specifically, the disability insurer terminated benefits after ignoring "overwhelming" evidence that the insured was totally disabled. (*Id.* at p. 457.) The insurer then withheld from its evaluating physician information about the insured's job duties and reports from other physicians in order to elicit a pro-insurer opinion from the evaluating physician. (*Id.* at pp. 459-460.) As a result of the termination of benefits, the insured was forced to sell her home and subsequently attempted suicide by ingesting an entire bottle of Valium. (*Id.* at p. 460.)

Relying on these cases, the Bocks argue that their pleading was sufficient. In their words, "Similar to the factual situation in *Little* and *Younan*, the Bocks alleged that Hansen ignored the overwhelming evidence that supported coverage; altered the scene of the accident in order to later deny the claim; created a false claim report stating that the Bocks had confirmed no damage to their floor and fence even though the Bocks never made those statements . . . ; conspired with an unlicensed contractor to create a knowingly false report that was used to wrongly deny the Bocks' claim for damage to their chimney; and that Hansen knew the chimney was the Bocks' primary source of heat and that winter was approaching. [Citation.] [¶] The FAC also alleged that when the Bocks submitted documentation, including and [*sic*] expert report and photographs, directly refuting the stated grounds for the denial, Hansen refused to even acknowledge, let consider [*sic*] the information. [Citation.] [¶] The Bocks also alleged that Hansen made rude and disparaging remarks to them as part of his outrageous course of conduct. [Citation.] Insults, indignities, and threats are also part on [*sic*] an outrageous course of conduct that will subject a defendant to liability. [Citation.]"

We are not persuaded. The setting here is a far cry from those in *Youman* or *Little*, where the insureds were particularly susceptible to distress, the insured in *Younan* unable to provide for his family, the insured in *Little* forced to sell her house. The Bocks were not disabled and were not facing a denial of benefits necessary to pay for their daily

19

living expenses. While the Bocks allege that Hansen knew they were vulnerable because the chimney was their primary source of heating, they do not allege Hasen knew they would have to go without heat for the winter, did not have the resources to otherwise repair the chimney, or would be unable to use an alternative heating source—nor that any of these events actually occurred.

As noted, *Pair* was a summary judgment case citing other summary judgment cases. The Bocks contend that whether conduct is outrageous is "usually a question of fact," citing *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1045 and *Ragland v. U.S. Bank National Assn., supra,* 209 Cal.App.4th 182, 204. While both cases say what the Bocks represent, many cases have dismissed intentional infliction of emotional distress cases on demurrer, concluding that the facts alleged do not amount to outrageous conduct as a matter of law. (See, for example, *Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594, 1608–1609; *Coleman v. Republic Indemnity Ins. Co.* (2005) 132 Cal.App.4th 403, 416–417; *Ricard v. Pacific Indemnity* (1982) 132 Cal.App.3d 886, 895.) This case may be another. But it is too early to tell.

As noted, the Bocks requested leave to amend below, which the trial court denied without explanation, indeed, probably without reflection, given the basis of its ruling. We review that denial for abuse of discretion. "While the decision to sustain or overrule a demurrer is a legal ruling subject to de novo review on appeal, the granting of leave to amend involves an exercise of the trial court's discretion. [Citations.] When the trial court sustains a demurrer without leave to amend, we must also consider whether the complaint might state a cause of action if a defect could reasonably be cured by amendment. If the defect can be cured, then the judgment of dismissal must be reversed to allow the plaintiff an opportunity to do so. The plaintiff bears the burden of demonstrating a reasonable possibility to cure any defect by amendment." (*Traders Sports, Inc., supra,* 93 Cal.App.4th at p. 43.)

The Bocks contend that they can allege additional facts to support their claim that Hansen acted outrageously. According to them, these facts include that "Hansen deliberately withheld information from Vertex and Roy Anderson in order to ensure that

the Vertex report would support Hansen's pre-determined decision to deny the Bocks' claim"; that Hansen sent Anderson his own conclusions as to why the chimney damage was not caused by the tree limbs before Anderson wrote his report; that Hansen subsequently edited Anderson's report before it was finalized; and that Hansen's supervisor took notes that acknowledged damage to the Bocks' home, which were never put into the claim file and have since been destroyed." The Bocks also claim that they could state facts that show Hansen abused a relationship of power over them and that he knew they were susceptible to injuries through mental distress, although they failed to actually name those facts. In light of the Bock's contention, and the fact that the trial court did not even address their request, we reverse, to allow the Bocks to amend their claim.

## DISPOSITION

The judgment for Hansen is reversed, and the matter remanded for further proceedings consistent with this opinion. The Bocks shall recover their costs on appeal.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Haerle, J.

21

Trial Court:                                       Napa County Superior Court

Trial Judge:                                     Honorable Diane M. Price

Attorney for Plaintiffs and Appellants:     GCA Law Partners, Kathryn C. Curry, Kenneth R. Van Vleck

Attorneys for Defendant and Respondent:    Horvits & Levy, Peder K. Batalden, Julie L. Woods; Weston & McElvain, Randy M. McElvain