Filed 4/26/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JULIA DANIELS et al., | H040487 |
| Plaintiffs and Appellants, | (Santa Cruz County Super. Ct. No. CV176513) |
| v. | |
| SELECT PORTFOLIO SERVICING, INC., et al., | |
| Defendants and Respondents. | |
| JULIA DANIELS et al., | H040990 |
| Plaintiffs and Appellants, | (Santa Cruz County Super. Ct. No. CV176513) |
| v. | |
| BANK OF AMERICA, N.A. et al., | |
| Defendants and Respondents. | |

Appellants Julia and Andre Daniels obtained a $650,000 adjustable rate loan secured by a deed of trust on their Santa Cruz residence. When their interest rate adjusted upward, they struggled to make their loan payments. Appellants spent years in unsuccessful attempts to obtain a loan modification from their then-loan servicer, Bank of America, N.A. (BofA). In the process, they fell behind on their loan payments, allegedly at the behest of BofA.

Appellants sued BofA and several other entities to prevent a non-judicial foreclosure sale of their home and to collect monetary damages. Respondents are four entities with ties to the deed of trust on appellants' residence: Select Portfolio Servicing,

Inc. (SPS) and BofA, both of which serviced appellants' loan; U.S. Bank National Association (U.S. Bank), the trustee of the securitized trust that owns the loan; and ReconTrust Company, N.A. (ReconTrust), the substituted trustee of the deed of trust (collectively respondents).

The trial court sustained SPS and U.S. Bank's demurrer to the first amended complaint without leave to amend and entered judgment in their favor. The trial court dismissed all of the claims against BofA and ReconTrust by way of a motion for judgment on the pleadings and entered a second judgment in their favor. Appellants appeal both judgments of dismissal.[1]

For the reasons set forth below, we reverse and remand with directions. In doing so, we hold, among other conclusions, that: when a lender acquires by assignment a loan being administered by a loan servicer, the lender may be liable to the borrower for misrepresentations made by the loan servicer, as the lender's agent, after that assignment; and, a loan servicer may owe a duty of care to a borrower through application of the *Biakanja*[2] factors, even though its involvement in the loan does not exceed its conventional role.

## I. FACTUAL AND PROCEDURAL BACKGROUND[3]

### A. *The Loan and Deed of Trust*

Appellants obtained an adjustable rate mortgage in the amount of $650,000 from SCME Mortgage Bankers, Inc. (SCME) in May 2005. They wanted a fixed rate loan, but

---

[1] We ordered that the two appeals be considered together for purposes of briefing, oral argument, and disposition.

[2] *Biakanja v. Irving* (1958) 49 Cal.2d 647 (*Biakanja*).

[3] The factual background is based on the allegations in the operative complaint and matters subject to judicial notice. The facts alleged in the pleading are deemed to be true, but contentions, deductions, and conclusions of law are not. (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 777 (*Pac Anchor*).) In addition to the complaint, we also may consider matters subject to judicial notice. (*Ibid.*)

their broker told them the loan with an adjustable rate was the best one for which they qualified and assured them they could refinance to a fixed rate within two years. The loan had a 1 percent interest-only rate for the first year and was secured by a deed of trust on their residence in Santa Cruz, California.

### B. *Appellants' Attempts to Obtain a Loan Modification From BofA*

Countrywide took over the servicing of the loan. In early 2008, appellants requested that Countrywide refinance or modify the loan. They were told neither was possible because BofA was in the process of acquiring the right to service the loan. In December 2008, appellants contacted BofA about refinancing the loan. After contacting BofA on a weekly basis for months, appellants received a loan modification application in mid-2009. BofA employees represented that appellants "would be granted a modification" if they complied with all of BofA's requests and "would be evaluated for a loan modification in good faith." Appellants returned the completed application with the documents BofA requested. When appellants called to check on the status of their application, they were told by multiple BofA employees that they had provided all of the necessary documentation and "were still under review for the loan modification." Between three and five months later, BofA denied their application purportedly because appellants did not provide all of the requested documents. Appellants applied for a loan modification a second time and were again denied for failure to provide documentation, despite BofA's representations that it had received the necessary documents. Appellants continued to make their regularly monthly payments to BofA.

In mid-2010, appellants again contacted BofA about a loan modification and were told they needed to be at least three months delinquent in their payments to qualify. The BofA employees "led [appellants] to believe that they would be granted a loan modification if they complied with all of [BofA's] instructions, requests and if they became at least three months delinquent in their monthly mortgage payments." Appellants, who until that time were current on their monthly payments, missed three

3

payments at the behest of BofA. They again contacted BofA and were told to make reduced payments of $1,000 per month, which they did. Appellants "believed that the payments were trial plan payments and that upon completion of the trial plan, [they] would be granted a permanent modification that would provide them with a fixed interest rate."

At some point, appellants attempted to resume making their regular, higher monthly payments, but BofA refused to accept those payments. BofA continued to accept the $1,000 monthly payments until the end of 2011, at which point it stopped accepting payments from appellants.

Appellants "continued to attempt to obtain a loan modification" and "continued to submit any and all documents that [BofA] requested." They "were continually told," by, among others, BofA employee Johnny Pearson "in or about the end of 2011", that BofA did not receive the documents they submitted, even after BofA confirmed receipt of those documents. They "were continually denied for a loan modification."

In June 2012, appellants again applied to BofA for a loan modification. Pearson informed them BofA would not modify their loan because their house was "underwater."

SPS began servicing appellants' loan on December 1, 2012. In supplemental briefing, appellants informed us that SPS no longer services their loan and that, during the pendency of this appeal, they entered into a loan modification agreement with their new loan servicer.

### C.    *Assignment of the Deed of Trust*

In August 2011, Mortgage Electronic Registration Systems, Inc., assigned its interest in the deed of trust to U.S. Bank as trustee for the certificate holders of Harborview Mortgage Loan Trust 2005-08, Mortgage Loan Pass-through Certificates, Series 2005-08 (Securitized Trust). Appellants allege that assignment was void because the Securitized Trust closed on July 29, 2005, prior to the date of the assignment. Alternatively, appellants allege the deed of trust and note never were transferred into the

4

Securitized Trust.  U.S. Bank substituted ReconTrust as the trustee under appellants' deed of trust in August 2012.

### D.    *Notices of Default and Trustee's Sale*

In August 2012, ReconTrust recorded a notice of default and election to sell, stating appellants were more than $127,000 in arrears.  On November 28, 2012, ReconTrust recorded a notice of trustee's sale.  The property has not been sold.

### E.    *The* **Maxam** *Action*

Appellants were plaintiffs in a mass joinder action against Countrywide, BofA, ReconTrust, and CTC Real Estate Services, Inc., in 2011.  That action, *Maxam et al. v. Bank of America*, *N.A. et al.* (Super. Ct. Orange County, 2011, No. 30-2011-00450819-CU-MT-CXC (*Maxam*)), was filed in February 2011 in Orange County Superior Court.  The second amended complaint, filed on June 9, 2011, added appellants as plaintiffs and asserted causes of action for (1) fraudulent concealment; (2) intentional misrepresentation; (3) negligent misrepresentation; (4) injunctive relief for violation of Civil Code section 2923.5; and (5) unfair competition under Business and Professions Code section 17200 on behalf of more than 1,000 plaintiffs.

The *Maxam* second amended complaint alleged the plaintiffs "borrowed money from Countrywide or its subsidiaries or affiliates."  It further alleged that Countrywide falsely inflated property appraisals and then, using those overstated home values and disregarding their own underwriting requirements, induced the plaintiffs into taking loans Countrywide knew they could not afford.  Countrywide then allegedly securitized plaintiffs' loans and sold the resulting collateralized mortgage pools to third party investors at inflated prices in a scheme to "bilk" those investors.  As a result of the ensuing liquidity crisis and collapse of Countrywide, both of which Countrywide allegedly foresaw, plaintiffs' property values fell, they lost access to other sources of financing, and their credit ratings were damaged.

With respect to loan modification, the second amended complaint alleged BofA directed other respondents to "advis[e] [Appellants] that [Respondents] would consider loan modifications, while at the same time covertly referring Plaintiffs' files to servicing companies in India instructed to obfuscate, badger, delay and divert the Plaintiffs from enforcing their rights." It further alleged "Defendant profess willingness to modify Plaintiffs' loans . . . , but . . . persist . . . in their secret plan to use Indian or other offshore servicing companies to deprive Plaintiffs of their rights." And the *Maxam* plaintiffs alleged BofA and Countrywide falsely represented to "multiple Plaintiffs that they would be assisted by [Respondents] in a loan modification."

The *Maxam* respondents demurred to the second amended complaint. On January 27, 2012, the trial court sustained the demurrer with 60 days' leave to amend, reasoning the plaintiffs had failed "to state facts which provide a basis for liability of each of the [Respondents] to each [Appellants]." The court pointed out a number of other deficiencies in the complaint, including that the plaintiffs failed to allege they knew of the alleged misrepresentations, relied upon them, or were injured by them. With respect to any misrepresentation claims "based on alleged promises regarding loan modifications," the court noted that the plaintiffs "fail[ed] to plead when, where and how the alleged misrepresentations were made, who made them, facts showing the person's authority to speak, the specific content of the representation and facts showing why the representation was false," or "facts showing reliance on the alleged misrepresentations."

Many of the plaintiffs, including appellants, failed to file an amended complaint within the 60 days allotted, and the trial court entered a judgment of dismissal with prejudice against them on April 3, 2013. Four months later, in August 2013, appellants moved to set aside the judgment due to its "preclusive effect on [their] legitimate and meritorious claims." In support of that motion, they claimed to have been "unaware of the status of the litigation" and characterized their lack of awareness as excusable neglect. The trial court denied the motion, noting that "no less than 8 communications were sent

6

to all the Plaintiffs, including the Daniels," regarding their attorney's "failure . . . to protect their interests."[4]

### F.    The Current Action

Appellants filed the instant action against SCME, SPS, U.S. Bank, BofA, and ReconTrust on March 19, 2013.  The operative first amended complaint, filed on July 11, 2013, asserts eight causes of action:  intentional misrepresentation; negligent misrepresentation; breach of contract; promissory estoppel; negligence; wrongful foreclosure; unlawful business practices in violation of Business and Professions Code section 17200 et seq. (UCL); and civil conspiracy.[5]  Those claims are largely premised on BofA's conduct in connection with the loan modification process.  Appellants also seek relief based on misrepresentations SCME made when it originated the loan, as well as irregularities in U.S. Bank's securitization of the loan.

SPS and U.S. Bank filed a demurrer on August 30, 2013, arguing appellants failed to adequately allege any of their claims, which, in any event, were barred by the res judicata effect of the *Maxam* action.  At a hearing, the court sustained the demurrer without leave to amend on res judicata grounds.  The court issued a written order sustaining the demurrer on October 17, 2013, and entered judgment in favor of SPS and U.S. Bank.

Thereafter, BofA and ReconTrust successfully moved for judgment on the pleadings on the ground appellants' claims were barred by res judicata.  The trial court

---

[4] The court's ruling reflects that the attorney was "relieved from his duties as counsel for the Plaintiffs" and, according to appellants, that attorney was disbarred as a consequence of his actions in the *Maxam* action.

[5] All eight causes of action are asserted against BofA, U.S. Bank, and SPS.  The wrongful foreclosure, UCL, and civil conspiracy claims also are asserted against ReconTrust.  And the intentional misrepresentation, negligent misrepresentation, and UCL causes of action are directed against SCME, in addition to BofA, U.S. Bank, and SPS.  However, apparently SCME was never served.  In any event, it is not a party to this appeal.

7

separately entered judgment in favor of BofA and ReconTrust. Appellants timely appealed both judgments. This court ordered the appeals to be considered together for the purpose of briefing, oral argument and disposition.

## II. DISCUSSION

### A. *Standard of Review*

The same de novo standard of review applies to motions for judgment on the pleadings and to general demurrers. (*Pac Anchor*, *supra*, 59 Cal.4th at p. 777.) In both instances, we exercise our independent judgment as to whether a cause of action has been stated under any legal theory when the allegations are liberally construed. (*International Assn. of Firefighters*, *Local 230 v. City of San Jose* (2011) 195 Cal.App.4th 1179, 1196.) The facts alleged in the pleading are deemed to be true, but contentions, deductions, and conclusions of law are not. (*Pac Anchor*, *supra*, at p. 777.) In addition to the complaint, we also may consider matters subject to judicial notice. (*Ibid.*)

We do not review the validity of the trial court's reasoning. (*B & P Development Corp. v. City of Saratoga* (1986) 185 Cal.App.3d 949, 959.) For that reason, and because demurrers and motions for judgment on the pleadings raise only questions of law, we may also consider new theories on appeal to challenge or justify the trial court's rulings. (*Ibid.* [demurrer]; *Burnett v. Chimney Sweep* (2004) 123 Cal.App.4th 1057, 1065 [judgment on the pleadings].)

We review the trial court's denial of leave to amend for abuse of discretion. (*Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 242.) "Where a demurrer is sustained without leave to amend, [we] must determine whether there is a reasonable probability that the complaint could have been amended to cure the defect; if so, [we] will conclude that the trial court abused its discretion by denying the plaintiff leave to amend. [Citation.] The plaintiff bears the burden of establishing that it could have amended the complaint to cure the defect." (*Berg & Berg Enterprises*, *LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1035.)

8

### B. *Preclusion*

Respondents urge us to affirm the trial court's dismissal of the majority of appellants' causes of action on "res judicata" grounds. Specifically, respondents maintain the causes of action alleging misconduct in connection with the origination of appellants' loan and their attempts to modify that loan are precluded by the *Maxam* judgment. Respondents concede that claims premised on the alleged improper securitization of appellants' loan—i.e., the wrongful foreclosure cause of action and portions of the UCL claim—are not precluded by the prior action.[6]

As our high court recently explained, the terminology it and other courts have employed "in discussing the preclusive effect of judgments has been inconsistent" and imprecise. (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 823 (*DKN Holdings*).) The Supreme Court has "used 'res judicata' as an umbrella term encompassing both claim preclusion and issue preclusion." (*Ibid.*) But it has also "sometimes described 'res judicata' as synonymous with claim preclusion, while reserving the term 'collateral estoppel' for issue preclusion." (*Id.* at p. 824.) And yet, on other occasions, it has "used the term 'res judicata' more broadly, even in a case involving only *issue* preclusion, or collateral estoppel." (*Ibid.*) This inconsistency has "caused some confusion," including among respondents in this case, as discussed below. (*Id.* at p. 823.)

"To avoid future confusion" between the two types of preclusion, which "have different requirements," the court endorsed the use of the terms " 'claim preclusion' " and " 'issue preclusion.' " (*DKN Holdings*, *supra*, 61 Cal.4th at p. 824.) Claim preclusion "bar[s] relitigation of [a] claim altogether" where a second suit involves: "(1) the same cause of action (2) between the same parties [or those in privity with them] (3) after a

---

[6] Oddly, below respondents claimed all of appellants' claims were barred by res judicata. Indeed, res judicata was the sole basis for BofA and ReconTrust's motion for judgment on the pleadings.

final judgment on the merits in the first suit." (*Ibid.*) Issue preclusion bars "a party to the first lawsuit, or one in privity with a party" to the first lawsuit, from relitigating issues that were "actually litigated" and "conclusively resolve[d]" in the first lawsuit. (*Ibid.*) Unlike claim preclusion, issue preclusion (1) "does not bar entire causes of action," but "prevents relitigation of previously decided issues" and (2) "can be raised by one who was not a party or privy in the first suit." (*Ibid.*)

It is apparent from respondents' briefs below that they invoked claim preclusion, not issue preclusion. For example, respondents argued that the *Maxam* judgment barred claims that were not, but could have been, raised and litigated in that action. Only claim preclusion bars claims that could have been raised in the first proceeding; issue preclusion requires actual litigation of issues. (*Noble v. Draper* (2008) 160 Cal.App.4th 1, 11 ["Whereas res judicata [(claim preclusion)] bars claims that *could have been* raised in the first proceeding regardless of whether or not they were raised [citation], collateral estoppel [(issue preclusion)] bars only issues that were actually and necessarily decided in the earlier litigation"]; *Murphy v. Murphy* (2008) 164 Cal.App.4th 376, 401 ["Clearly a former judgment is not a collateral estoppel on issues which might have been raised but were not"].) Moreover, respondents addressed the primary rights theory (or cases applying it). "[T]he primary rights theory . . . implicates matters of claim preclusion (res judicata), not issue preclusion or collateral estoppel." (*Johnson v. GlaxoSmithKline, Inc.* (2008) 166 Cal.App.4th 1497, 1517.) Accordingly, we turn to the elements of claim preclusion.

### 1.    Same Parties

We begin with the second of the three elements that must be satisfied for claim preclusion to apply: the two lawsuits must involve the same parties or those in privity with them. (*DKN Holdings*, *supra*, 61 Cal.4th at p. 824.) BofA and ReconTrust were defendants in the *Maxam* action, such that the "same parties" element is satisfied as to those entities. However, SPS and U.S. Bank were not parties in *Maxam*. Nor do

10

respondents contend SPS and U.S. Bank were in privity with any of the *Maxam* respondents. Rather, they rely on *Bernhard v. Bank of America* (1942) 19 Cal.2d 807 for the proposition that the party asserting claim preclusion need not have been a party, or in privity with a party, to the earlier litigation. But, as the *DKN Holdings* court explained, *Bernhard v. Bank of America* involved "only *issue* preclusion," not claim preclusion, although the court confusingly used the term res judicata. (*DKN Holdings*, *supra*, at p. 824.) Accordingly, the "same parties" element is not satisfied as to SPS and U.S. Bank. Therefore, claim preclusion does not bar appellants' claims against those entities.

### 2. *Final Judgment on the Merits*

For claim preclusion to bar any of appellants' claims against BofA and ReconTrust, there must have been a final judgment on the merits in the *Maxam* suit. In *Maxam*, a judgment of dismissal with prejudice was entered after a general demurrer had been sustained with leave to amend and appellants failed to amend.

Our high court has held that the preclusive effect of such a judgment "is of limited scope." (*Wells v. Marina City Properties, Inc.* (1981) 29 Cal.3d 781, 789 (*Wells*).) A former judgment entered after a general demurrer is sustained with leave to amend " 'is a judgment on the merits to the extent that it adjudicates that the facts alleged do not constitute a cause of action . . . .' " (*Wells*, *supra*, at p. 789, quoting *Keidatz v. Albany* (1952) 39 Cal.2d 826, 828 (*Keidatz*).) Accordingly, such a judgment will bar "a subsequent action alleging the same facts," as well as one alleging "different facts . . . if the demurrer was sustained in the first action on a ground equally applicable to the second." (*Keidatz*, *supra*, at p. 828.) However, the former judgment will not bar a subsequent action alleging "new or additional facts . . . that cure the defects in the original pleading."[7] (*Keidatz*, *supra*, at p. 828.)

---

[7] In *Hardy v. America's Best Home Loans* (2014) 232 Cal.App.4th 795, the court concluded that a dismissal under rule 41(b) of the Federal Rules of Civil Procedure for (continued)

11

The current action alleges facts about the origination and attempted modification of appellants' loan that were not alleged in *Maxam*.[8] Thus, the final judgment on the merits requirement is satisfied only if, despite the newly alleged facts, appellants' claims are (1) susceptible to a demurrer (2) on the same grounds that the demurrer in *Maxam* was sustained.

Notably, the order sustaining the demurrer in *Maxam* was not before the trial court; this court took judicial notice of that order at appellants' request. Accordingly, the trial court could not have analyzed whether appellants' claims are susceptible to a demurrer for the same reasons the demurrer in *Maxam* was sustained. Indeed, that issue was not even briefed below. Nor is it properly developed on appeal. Respondents argue in conclusory fashion that "the [*Maxam*] court sustained defendants' demurrer on grounds equally applicable to the present case—*for instance*, that the fraud claims were not pleaded with the required specificity, that the plaintiffs failed to allege facts showing their fraud claims were timely, and that their loan modification claims were barred by the statute of frauds." (Italics added.) That argument sheds little light on the question at

_____

failure to obey the district court's order to file an amended complaint did not constitute a final judgment on the merits for issue preclusion purposes because it was akin to a dismissal for failure to prosecute. Prior to the rule 41(b) dismissal, the federal court had granted in part and denied in part a motion to dismiss and ordered Hardy to file an amended complaint. By contrast, here, none of appellants' claims survived the *Maxam* demurrer. " ' "When a general demurrer . . . is sustained, and the plaintiff declines to amend, he practically confesses that he has alleged in his pleading every fact he is prepared to prove in support of his action." ' " (*Wells*, *supra*, 29 Cal.3d at p. 785.) That is precisely the case here, and it is for that reason that, unlike in *Hardy*, the *Maxam* judgment may " ' "be regarded as a conclusive determination of the litigation on its merits." ' " (*Ibid*.)

[8] For example, the *Maxam* complaint alleged BofA made false representations to "multiple Plaintiffs" that they "would be assisted . . . in a loan modification." In the current action, appellants allege specific misrepresentations BofA employees made to them, such as that they needed to become delinquent in order to qualify for a loan modification.

12

hand—whether *each* of appellants' causes of action is susceptible to a demurrer for a reason relied on by the *Maxam* court in sustaining the demurrer there.

"We are not required to examine undeveloped claims or to supply arguments for the litigants." (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) Because the issue of whether the final judgment on the merits requirement is satisfied is insufficiently developed, we decline to determine whether claim preclusion bars any of appellants' claims. For the reasons discussed below, we conclude appellants are entitled to amend their complaint. If appellants do so, BofA or ReconTrust are free to reassert a claim preclusion defense.

## C.    *Intentional and Negligent Misrepresentation*

The elements of a cause of action for intentional misrepresentation are (1) a misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4) actual and justifiable reliance, and (5) resulting damage. (*Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 230-231 (*Chapman*).) The elements of a claim for negligent misrepresentation are nearly identical. Only the second element is different, requiring the absence of reasonable grounds for believing the misrepresentation to be true instead of knowledge of its falsity. (*Bock v. Hansen* (2014) 225 Cal.App.4th 215, 231; *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173-174 (*Small*).)

Causes of action for intentional and negligent misrepresentation sound in fraud and, therefore, each element must be pleaded with specificity. (*Chapman, supra*, 220 Cal.App.4th at p. 231; *Small, supra*, 30 Cal.4th at p. 184.) "The specificity requirement means a plaintiff must allege facts showing how, when, where, to whom, and by what means the representations were made, and, in the case of a corporate defendant, the plaintiff must allege the names of the persons who made the representations, their authority to speak on behalf of the corporation, to whom they spoke, what they said or wrote, and when the representation was made." (*West v. JPMorgan Chase Bank, N.A.*

13

(2013) 214 Cal.App.4th 780, 793 (*West*).)  However, "the requirement of specificity is relaxed when the allegations indicate that 'the defendant must necessarily possess full information concerning the facts of the controversy' [citations] or 'when the facts lie more in the knowledge of the' " defendant.  (*Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 158.)  The specificity requirement serves two purposes:  "to apprise the defendant of the specific grounds for the charge and enable the court to determine whether there is any basis for the cause of action."  (*Chapman*, *supra*, at p. 231.)

Ordinarily, a general demurrer may not be sustained, nor a motion for judgment on the pleadings granted, as to a portion of a cause of action.  (*Fire Ins. Exchange v. Superior Court* (2004) 116 Cal.App.4th 446, 452.)  *PH II, Inc. v. Superior Court* (1995) 33 Cal.App.4th 1680 is instructive.  There, the complaint asserted a cause of action for legal malpractice based on several distinct incidents.  The superior court sustained a demurrer to a portion of the cause of action involving a single incident of alleged malpractice.  (*Id.* at p. 1681.)  The First District Court of Appeal reversed, concluding the "trial court could not properly sustain the demurrer as to only that portion" of the legal malpractice claim.  (*Id.* at p. 1682.)  The court noted that defendants may attack any portion of a cause of action that is "substantively defective on the face of the complaint . . . by filing a motion to strike."  (*Id.* at pp. 1682-1683.)

Here, appellants' intentional and negligent misrepresentation causes of action are based on six distinct misrepresentations (one by SCME and five by BofA).  In view of the rule discussed above, the question for this court is whether appellants stated a claim for intentional or negligent misrepresentation based on *any* of the alleged

14

misrepresentations.[9] The claims are directed against BofA, SPS, and U.S. Bank. We address the liability of each of those respondents separately.

### 1. Appellants Stated Intentional and Negligent Misrepresentation Causes of Action Against BofA Based on Misrepresentation No. 5

The fifth alleged misrepresentation was made over the phone by BofA employee Johnny Pearson at the end of 2011. Pearson falsely represented that BofA had not received financial documents appellants had submitted in support of their loan modification application.

Respondents contend appellants failed to allege with the requisite particularity when the misrepresentation was made. We disagree. The identification of Pearson as the individual who made the representation and the general timeframe of the conversation are sufficient "to apprise the defendant of the specific grounds for the charge." (*Chapman*, *supra*, 220 Cal.App.4th at p. 231.)

Respondents also maintain appellants failed to allege actual or justifiable reliance on Pearson's representation that BofA had not received their documents. "To allege actual reliance on misrepresentations with the required specificity for a fraud count, ' "[t]he plaintiff must plead that he believed the representations to be true . . . and that in reliance thereon (or induced thereby) he entered into the transaction." ' " (*Chapman*, *supra*, 220 Cal.App.4th at pp. 231-232.) Reading the first amended complaint liberally, as we must, it alleges appellants relied on Pearson's representation by submitting additional documentation in support of their loan modification application, continuing to participate "in the modification process instead of seeking other alternatives," and "spen[ding] time and money engaging in the modification process." While appellants did not explicitly allege they believed the representation, "[o]n appeal from a judgment of

---

[9] Because a demurrer may not be sustained as to a portion of a cause of action, we decline to address respondents' arguments that appellants' intentional misrepresentation, negligent misrepresentation, and promissory estoppel claims are *partially* time-barred.

15

dismissal entered upon the sustaining of a demurrer without leave to amend, we must treat the demurrer as admitting all material facts properly pleaded and all reasonable inferences which can be drawn therefrom." (*Bloomberg v. Interinsurance Exchange* (1984) 162 Cal.App.3d 571, 574-575.) Here, we can reasonably infer from the allegations that appellants believed the representation. (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 327 [complaint adequately alleges reliance where "from its allegations one could infer the plaintiff had relied on a defendant's representation"].) Thus, we conclude appellants adequately allege actual reliance.

Respondents contend any reliance by appellants was not justifiable because "[t]hey would have known . . . better than anyone else" "what documents they sent in." But appellants do not allege they relied on a representation about what documents they *submitted*. They say they relied on a representation about which of those documents BofA actually *received*, something exclusively in BofA's knowledge. We have no trouble concluding appellants could reasonably have relied on the BofA employee assigned to handle their loan modification application for information regarding whether BofA had in its possession the documents necessary to process that application.

Appellants sufficiently pleaded the remaining elements of a cause of action for intentional misrepresentation, including that knowledge of the representation's falsity, intent to induce reliance, and resulting damage in the form of "damage to [appellants'] credit, increased interest and arrears that they would not have otherwise incurred," time and money spent engaging in the modification process, and foregoing other alternatives to avoid foreclosure. For purposes of their negligent misrepresentation claim, appellants allege the absence of reasonable grounds for believing the misrepresentation to be true.

For the foregoing reasons, we conclude appellants stated intentional and negligent misrepresentation claims against BofA based on the fifth misrepresentation. Because the trial court's order granting the motion for judgment on the pleadings as to the first and

16

second cause of action against BofA must be reversed, we need not determine whether those causes of action are also viable based on the other alleged misrepresentations.

### 2. Appellants Failed to State Intentional and Negligent Misrepresentation Causes of Action Against SPS

Appellants allege SPS is liable for misrepresentations by BofA employees because SPS is "attempting to enforce the [loan] which carries the taint of the stated misrepresentation." On appeal, they do not support that conclusory allegation with "substantive argument or citation to authority," thereby abandoning the argument. (*Mangano v. Verity, Inc.* (2009) 179 Cal.App.4th 217, 222, fn. 6 (*Mangano*).) Instead, they argue that "SPS (as successor to Bank of America)" is liable for BofA's misrepresentations because it "still benefit[s] from Ban[k] of America's fraudulent conduct under agency and successor-in-liability theories."

Respondents' brief does not address the adequacy of the allegations seeking to hold SPS secondarily liable for BofA's alleged misrepresentations. We requested additional briefing from both parties on that topic.[10] In their supplemental brief, appellants assert a new theory, arguing that SPS is liable as the assignee of BofA's servicing rights to the loan.[11] U.S. Bank and SPS argue in their supplemental brief that SPS is not secondarily liable for BofA's misrepresentations because appellants merely

---

[10] Specifically, we requested that the parties address whether the first amended complaint's secondary liability allegations against U.S. Bank and SPS are sufficient. (*Tsemetzin v. Coast Federal Savings & Loan Assn.* (1997) 57 Cal.App.4th 1334, 1341, fn. 6 ["It makes no difference that the issue was first raised on appeal by the court rather than the parties, as long as the parties have been given a reasonable opportunity to address it."].)

[11] In their supplemental brief, appellants also assert "SPS can and should be held liable for any and all damages that occurred during the time SPS serviced the [loan]." This unsupported claim provides no basis for holding SPS liable for any of BofA's conduct.

17

allege SPS is an agent of U.S. Bank. They contend there is no authority for holding a current agent (SPS) liable for the acts of its principal's former agent (BofA).

Appellants' contention that SPS can be held liable for BofA's misrepresentations on an agency theory fails. Appellants have not alleged the existence of an agency relationship between SPS and BofA. The first amended complaint does allege SPS has been acting as U.S. Bank's agent (presumably since SPS began servicing appellants' loan in December 2012), but appellants do not explain how that relationship might expose SPS to liability for fraud committed by one of U.S. Bank's former agents, BofA, prior to December 2012. As U.S. Bank and SPS note, current agents generally are not liable for the acts of their principals' former agents.

With respect to successor-in-interest liability, as a general rule, "a corporation purchasing the principal assets of another corporation . . . does not assume the seller's liabilities unless (1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." (*Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 28.) Here, appellants do not allege SPS purchased or otherwise acquired BofA's principal assets, let alone that any exception to the ordinary rule of successor nonliability applies.

Appellants' theory of assignee liability fails as well. "The legal concept of assignment refers to the transferability of all types of property . . . ." (*Arabia v. BAC Home Loans Servicing, L.P.* (2012) 208 Cal.App.4th 462, 472.) "The general rule is that the mere assignment of rights under an executory contract does not cast upon the assignee the obligations imposed by the contract upon the assignor. . . . [However, a]ssumption of obligations may be implied from acceptance of benefits under the contract." (*Enterprise Leasing Corp. v. Shugart Corp.* (1991) 231 Cal.App.3d 737, 745.) Significantly, appellants did not allege BofA assigned anything to SPS. But even assuming SPS

assumed BofA's *contractual* obligations to service appellants' loan, tort liability is not a contractual obligation.

In sum, appellants failed to allege intentional and negligent misrepresentation claims against SPS. Respondents did not raise the deficiencies we have identified in appellants' theories of liability either below or in their respondent's brief. Therefore, we conclude that appellants should be granted an opportunity to amend their intentional and negligent misrepresentation claims against SPS. (See *McDonald v. Superior Court* (1986) 180 Cal.App.3d 297, 304 (*McDonald*) ["Liberality in permitting amendment is the rule . . . if a fair prior opportunity to correct the substantive defect has not been given."].)

### 3. *Appellants Stated Intentional and Negligent Misrepresentation Causes of Action Against U.S. Bank on an Agency Theory*

Appellants contend they adequately allege U.S. Bank is jointly liable for BofA's misrepresentations under an agency theory.[12] Respondents did not address the adequacy of the agency allegations in their brief. In response to our request for supplemental briefing, U.S. Bank and SPS maintain appellants "cannot seek to hold U.S. Bank liable as BofA's principal because they specifically allege . . . that U.S. Bank is a stranger to their loan" and that specific allegation trumps their general agency allegations.

We decline to apply "the principle that specific allegations in a complaint control over an inconsistent general allegation" for two reasons. (*Perez v. Golden Empire*

---

[12]Appellants also allege U.S. Bank "should be held liable for" BofA's misrepresentations "as beneficiary . . . of the [loan]." That allegation is a conclusion of law that we do not deem true in assessing the sufficiency of the complaint. (*Pac Anchor*, *supra*, 59 Cal.4th at p. 777.) Because appellants' briefs contain no argument or authority establishing the beneficiary of a loan may be liable for the fraud of a loan servicer, we consider the argument to be abandoned. (*Mangano*, *supra*, 179 Cal.App.4th at p. 222, fn. 6 [contention unsupported by "substantive argument or citation to authority" deemed abandoned]; *Berger v. Godden* (1985) 163 Cal.App.3d 1113, 1117 ["the failure of appellant to advance any pertinent or intelligible legal argument . . . constitute[s] an abandonment of the appeal"].)

19

*Transit Dist*. (2012) 209 Cal.App.4th 1228, 1236.) First, the agency allegations are not as general as U.S. Bank suggests. Appellants allege BofA "had authority to represent and bind [U.S. Bank] in regard to a modification of" their loan and U.S. Bank "directed and authorized [BofA's] conduct in connection with the [loan] modification by directing [BofA] concerning what to tell" appellants. Second, those allegations are consistent with the allegation that the assignment of the deed of trust to U.S. Bank was void. Appellants theory is that while the assignment was void, respondents have treated it as valid and, in the course of doing so, U.S. Bank controlled BofA's conduct related to appellants' attempts to modify their loan.

" 'An agent "is anyone who undertakes to transact some business, or manage some affair, for another, by authority of and on account of the latter, and to render an account of such transactions." [Citation.] "The chief characteristic of the agency is that of representation, the authority to act for and in the place of the principal for the purpose of bringing him or her into legal relations with third parties. [Citations.]" [Citation.] "The significant test of an agency relationship is the principal's right to control the activities of the agent." ' " (*Violette v. Shoup* (1993) 16 Cal.App.4th 611, 620.) As noted, appellants allege BofA "had authority to represent and bind [U.S. Bank] in regard to a modification of" their loan and U.S. Bank "directed and authorized [BofA's] conduct in connection with the [loan] modification by directing [BofA] concerning what to tell" appellants. These allegations are sufficient to plead the existence of an agency relationship between BofA and U.S. Bank.

"[A] principal is liable to third parties . . . for the frauds or other wrongful acts committed by [its] agent in and as a part of the transaction of" the business of the agency. (*Grigsby v. Hagler* (1938) 25 Cal.App.2d 714, 715.) Here, the alleged business of the agency was the servicing and modification of appellants' loan. Appellants allege the fifth misrepresentation was made at the end of 2011 (after U.S. Bank acquired an interest in the loan in August 2011) and in the course of servicing their loan, such that it was made

20

within the scope of the alleged agency. Therefore, we conclude appellants stated claims for intentional and negligent misrepresentation against U.S. Bank based on the fifth misrepresentation under an agency theory. We need not consider whether the misrepresentation claims against U.S. Bank are also viable based on the other alleged misrepresentations.

> 4. *Appellants Failed to State Intentional and Negligent Misrepresentation Causes of Action Against SPS, U.S. Bank, and ReconTrust Under a Civil Conspiracy Theory*

Appellants purport to assert an independent cause of action for civil conspiracy, in which they allege respondents "conspired" to "deceive and defraud" them into participating in the loan modification process. "Conspiracy is not an independent cause of action, but rather a doctrine imposing liability for a tort upon those involved in its commission." (*1-800 Contacts*, *Inc*. *v*. *Steinberg* (2003) 107 Cal.App.4th 568, 590.) Thus, liability for a conspiracy "must be activated by the commission of an actual tort." (*Applied Equipment Corp*. *v*. *Litton Saudi Arabia Ltd*. (1994) 7 Cal.4th 503, 511.) For example, in a claim for intentional misrepresentation: where one defendant "A" "alone made representations, the plaintiff can hold [other defendants (B and C)] liable with A only by alleging and proving that A acted pursuant to an agreement (conspiracy) with B and C to defraud. Thus, the purpose of the [conspiracy] allegation is to establish the liability of B and C as joint tortfeasors regardless of whether either was a direct participant in the wrongful act." (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 921, p. 335.)

Appellants' briefs make clear that they seek to hold U.S. Bank, SPS, and ReconTrust jointly liable for the misrepresentations by BofA employees under a civil conspiracy theory. Thus, the question on appeal is whether appellants adequately allege that BofA's misrepresentations were made pursuant to an agreement among BofA, U.S. Bank, SPS, and ReconTrust to defraud appellants. To allege a conspiracy, a plaintiff

21

must plead: "(1) formation and operation of the conspiracy and (2) damage resulting to plaintiff (3) from a wrongful act done in furtherance of the common design." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1062.)

Appellants' conspiracy allegations are too conclusory. As to the first element, they allege respondents "agree[d] . . . to deceive [appellants] into participating in the loan modification processes." There are no factual allegations about the nature of that agreement. Critically, appellants do not allege that respondents agreed to defraud them *before* the alleged misrepresentations were made (between 2009 and June 2012). Nor can we reasonably infer from the facts alleged that respondents agreed to defraud appellants before the misrepresentations were made, since appellants allege SPS did not become their loan servicer until December 1, 2012 and ReconTrust did not become trustee until August 2012. For these reasons, we conclude the trial court did not err in sustaining SPS and U.S. Bank demurrer as to the civil conspiracy cause of action without leave to amend, nor in granting BofA and ReconTrust's motion for judgment on the pleadings without leave to amend as to that claim.

### D. *Breach of Contract*

"A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1388.) The first amended complaint alleges appellants and BofA entered into an oral agreement under which BofA promised to "grant [appellants] a loan modification" and appellants agreed to make payments of $1,000 per month and to submit all required documentation. Appellants allege BofA breached the agreement by "failing to grant [them] a loan modification" after they carried out their contractual commitments "by submitting all of the required documentation and by making trial payments for over a year and a half."

22

Respondents characterize the alleged oral agreement as one "to modify the terms of a loan" and argue it lacks sufficiently definite terms to be enforceable. Specifically, they note the lack of any alleged agreement on terms including the interest rate, finance charges, and length of repayment. Appellants rely on a number of recent cases involving written trial period plans (TPP) offered under the federal home affordable modification program (HAMP), which have held that banks are contractually required to offer permanent loan modifications to borrowers who have complied with the requirements of a TPP. (E.g., *Corvello v. Wells Fargo Bank, NA* (9th Cir. 2013) 728 F.3d 878, 880 (*Corvello*); *West, supra*, 214 Cal.App.4th at p. 786; *Wigod v. Wells Fargo Bank, N.A.* (7th Cir. 2012) 673 F.3d 547, 563 (*Wigod*); *Bushell v. JPMorgan Chase Bank, N.A.* (2013) 220 Cal.App.4th 915, 925-926 (*Bushell*); *Rufini v. CitiMortgage, Inc.* (2014) 227 Cal.App.4th 299, 307 (*Rufini*).) Allegations of compliance with the TPP and failure by the bank to offer a permanent loan modification have been held to support claims for breach of contract or promissory estoppel. (*Wigod, supra*, at p. 555.) While appellants do not allege they entered into a TPP under HAMP, they analogize BofA's oral promises to those generally set forth in a TPP to argue the oral contract is enforceable. As discussed below, HAMP guidelines were critical to the reasoning of the cases on which appellants rely. Absent those guidelines for determining the essential terms of a permanent loan modification, the terms of the alleged agreement are not sufficiently definite to render it enforceable.

1. *Appellants Do Not Allege the Existence of a Sufficiently Definite Contract*

"The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy. ' "Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable." ' " (*Moncada v. West Coast Quartz Corp.* (2013) 221 Cal.App.4th 768, 777.) Typically, a contract

23

involving a loan must include the identity of the lender and borrower, the amount of the loan, and the terms for repayment in order to be sufficiently definite. (*Peterson Development Co. v. Torrey Pines Bank* (1991) 233 Cal.App.3d 103, 115.) Preliminary negotiations or agreements for future negotiations—so-called agreements to agree—are not enforceable contracts. (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 213-214.)

The leading case on the contractual obligations of banks under TPP agreements is the Seventh Circuit's decision in *Wigod*, which courts in this state have followed. (*West*, *supra*, 214 Cal.App.4th at p. 786; *Bushell*, *supra*, 220 Cal.App.4th at pp. 925-927; see *Corvello*, *supra*, 728 F.3d at pp. 883-884 [applying California law].) Some background about HAMP and its implementing regulations is necessary to understanding the reasoning of *Wigod* and its progeny.

"When financial markets nearly collapsed in the late summer and early fall of 2008, Congress enacted the Emergency Economic Stabilization Act of 2008 (Pub.L. No. 110-343 (Oct. 3, 2008) 122 Stat. 3765). (*Wigod*, *supra*, 673 F.3d at p. 556.) The centerpiece of this act was the federal Troubled Asset Relief Program (TARP) which, in addition to providing a massive infusion of liquidation to the banking system, required the United States Department of the Treasury . . . to implement a plan to minimize home foreclosures. (See *Wigod*, at p. 556; 12 U.S.C. § 5219(a).) [¶] That plan was HAMP, introduced in February 2009, and funded by a $50 billion set-aside of TARP monies to induce lenders to refinance mortgages to reduce monthly payments for struggling homeowners. (*Wigod*, *supra*, 673 F.3d at p. 556.) Specifically, HAMP enables certain homeowners who are in default or at imminent risk of default to obtain 'permanent' loan modifications, by which their monthly mortgage payments are reduced to no more than 31 percent of their gross monthly income for a period of at least five years. Lenders receive from the government a $1,000 incentive payment for each permanent HAMP

24

modification, along with other incentives." (*Bushell*, *supra*, 220 Cal.App.4th at pp. 922-923.)

"In its [HAMP] program directives, the Department of the Treasury set forth the exact mechanisms for determining borrower eligibility and for calculating modification terms." (*Wigod*, *supra*, 673 F.3d at p. 565.) The HAMP loan modification process "consisted of two stages. After determining a borrower was eligible, the servicer implemented a Trial Period Plan (TPP) under the new loan repayment terms it formulated using" the method prescribed by HAMP program directives. (*Id*. at p. 557.) "The trial period under the TPP lasted three or more months . . . . After the trial period, if the borrower complied with all terms of the TPP Agreement—including making all required payments and providing all required documentation—and if the borrower's representations remained true and correct, the servicer had to offer a permanent modification." (*Ibid*.)

In *Wigod*, Wells Fargo argued the TPP was unenforceable "because it did not specify the exact terms of the permanent loan modification, including the interest rate, the principal balance, loan duration, and the total monthly payment." (*Wigod*, *supra*, 673 F.3d at p. 564.) The Seventh Circuit rejected that argument, reasoning that the TPP was enforceable despite those open terms because the HAMP guidelines provided an " 'existing standard' by which the ultimate terms of Wigod's permanent modification were to be set." (*Id*. at p. 565.) Other courts likewise have held that the terms of a TPP are sufficiently definite to support the existence of a contract because banks must comply with HAMP guidelines in determining the terms of repayment under a modification agreement. (See *Sutcliffe v*. *Wells Fargo Bank*, *N.A*. (N.D. Cal. 2012) 283 F.R.D. 533, 552 ["Because Wells Fargo was required to comply with HAMP guidelines in determining the terms of repayment under a modification agreement, the Court concludes, at least at the pleading stage, that the terms of the TPP are sufficiently definite to support the existence of a contract."]; *In re JPMorgan Chase Mortg. Modification*

25

*Litigation* (D. Mass. 2012) 880 F.Supp.2d 220, 234 ["the TPP Agreements were sufficiently definite to survive a motion to dismiss, as any missing material terms were 'easily determinable through the mathematical formulas set out in the HAMP regulations and are thus "not open to negotiation or discretionary alteration by either side" ' "].)

Appellants neither allege, nor argue on appeal, that HAMP applies here. Thus, there are no guidelines for determining the essential terms of the loan modification they were promised. Without those essential terms or a way to derive them, appellants do not allege the existence of a sufficiently definite, and thus enforceable, contract requiring BofA to permanently modify their loan.

On appeal, appellants contend the contract was not missing any essential terms because it was not itself a modification agreement, "but rather an agreement *to modify*" under which "a new agreement would have issued" had respondents performed. But that argument does not save appellants' breach of contract claim, as such an agreement to agree is not enforceable. (*Bustamante v. Intuit, Inc.*, *supra*, 141 Cal.App.4th at pp. 213-214.)

### 2. Statute of Frauds

Respondents separately argue the alleged oral agreement is unenforceable because it fails to comply with the statute of frauds. "A contract coming within the statute of frauds is invalid unless it is memorialized by a writing subscribed by the party to be charged or by the party's agent." (*Secrest v. Security Nat. Mortg. Loan Trust 2002-2* (2008) 167 Cal.App.4th 544, 552 (*Secrest*).) "A mortgage or deed of trust . . . comes within the statute of frauds," as does an agreement modifying a mortgage or deed of trust. (*Ibid.*)

"[F]ull performance takes a contract out of the statute of frauds . . . where performance consisted of conveying property, rendering personal services, or doing something other than payment of money." (*Secrest*, *supra*, 167 Cal.App.4th at p. 556.) Here, appellants allege full performance of their obligations under the contract, which

26

included not only "making trial payments," but also "submitting all the required documentation." Therefore, the statute of frauds does not bar enforcement of the allege oral contract. (See *Corvello*, *supra*, 728 F.3d at p. 885 [statute of frauds did not bar enforcement of oral agreement to modify a mortgage where plaintiffs had alleged full performance of their obligations under the contract].)

### 3. Appellants Should Be Granted Leave to Amend Their Contract Claim

Appellants contend they should be permitted to amend their breach of contract claim "for the first time . . . if this Court determines [it] is insufficiently pleaded." Appellants make the same plea with respect to each of their causes of action. But, in fact, the record indicates appellants were previously permitted leave to amend following a successful demurrer.[13] Nevertheless, we conclude appellants should be given another opportunity to amend to address the specific pleading deficiencies (particularly those related to HAMP) we have identified, which have never been pointed out to them. (*McDonald*, *supra*, 180 Cal.App.3d at pp. 303-304; *Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 724 [giving plaintiffs a fifth opportunity to plead their claim after court of appeal "clarified and isolated [the] issue"].) While appellants did not allege HAMP governed their agreement with BofA, the first amended complaint does reference HAMP and, on appeal, they refer to their agreement as a "TPP." Thus, "whether or not [appellants] can so allege upon remand remains to be seen." (*Rufini*, *supra*, 227 Cal.App.4th at p. 306.)

In an effort to provide guidance to appellants on remand, we note that their secondary liability allegations seeking to hold SPS and U.S. Bank liable for BofA's alleged breach of contract are inadequate. Appellants allege SPS is liable because it "is

---

[13] Appellants' original complaint and the demurrer to that complaint are not in the record on appeal.

27

attempting to enforce" the loan. That allegation says nothing about SPS's liability for BofA's alleged breach of a separate contract, which occurred before SPS became appellants' loan servicer. In their supplemental brief, appellants rely on this court's decision in *Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89 (*Lona*).) There, the borrower sued his lender, loan servicer, and others to set aside a trustee's sale of his home on the ground that he was a victim of predatory lending. (*Id.* at p. 95.) This court reversed the trial court's grant of summary judgment to the lender and loan servicer, reasoning the borrower had "presented sufficient evidence of triable issues of material fact with regard to the alleged unconscionability of the transaction," and thus the unenforceability of the underlying loan. (*Ibid.*) Appellants' argument appears to be that, here, BofA's alleged breach of contract is a defense to enforcement of the underlying loan by any entity (including SPS). Therefore, SPS can be held liable under some unidentified theory of liability. The analogy to *Lona* is invalid because BofA is not alleged to have breached the loan agreement, which might render the loan unenforceable. Rather, BofA is alleged to have breached a separate oral agreement to modify the loan. It is far from clear that breaching that agreement would render the loan unenforceable by a subsequent loan servicer like SPS.

Appellants contend U.S. Bank is liable as BofA's principal. " 'It is a settled rule of the law of agency that a principal is responsible to third persons for the ordinary contracts and obligations of his agent with third persons made in the course of the business of the agency and within the scope of the agent's powers as such, although made in the name of the agent and not purporting to be other than his own personal obligation or contract.' " (*Luce v. Sutton* (1953) 115 Cal.App.2d 428, 433.) But the first amended complaint alleges BofA and appellants entered into the contract in mid-2009 or mid-2010, well before U.S. Bank acquired an interest in the deed of trust in August 2011 and thus before BofA was U.S. Bank's agent. The primary liability theory advanced in appellants' supplemental brief fails for the same reason. Appellants should be permitted

to amend their secondary liability allegations on remand, as no "fair prior opportunity to correct" these defects have been given. (*McDonald*, *supra*, 180 Cal.App.3d at p. 304.)

### E. *Promissory Estoppel*

In their cause of action for promissory estoppel, appellants allege BofA twice promised them a loan modification: BofA allegedly (1) "promised [them] a loan modification with lower monthly payments, a permanently reduced interest rate and a possible principal reduction of the total loan amount if [they] complied with all of [BofA's] requests and . . . sent [BofA] all of the required documentation" and (2) "promised [them] a loan modification if they became at least three months delinquent in their monthly mortgage payments and if they made trial plan payments of $1,000.00 per month." Appellants allege they relied on those promises by (1) applying for the promised loan modifications, (2) becoming delinquent in their monthly mortgage payments, (3) making the $1,000 monthly payments, (4) providing BofA with personal financial information, (5) spending time and resources applying for loan modifications, and (6) foregoing other remedies to cure the default. Appellants further allege BofA breached those promises by "denying" their "modification application" and "failing to grant" them a loan modification.

" 'The elements of a promissory estoppel claim are "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." ' " (*Jones v. Wachovia Bank* (2014) 230 Cal.App.4th 935, 945.)

Respondents argue the promissory estoppel cause of action is defective because appellants failed to allege injury. Not so. Appellants have adequately alleged detrimental reliance to sustain a promissory estoppel cause of action by alleging they "repeatedly contact[ed BofA], . . . repeatedly prepar[ed] documents at [BofA's] request,"

and foregoing "other means of avoiding foreclosure." (*Bushell*, *supra*, 220 Cal.App.4th at p. 930.)

Respondents further contend appellants failed to allege the promises with clarity as they did not specify any agreement on the essential terms of a loan agreement, such as the new lower interest rate. We agree. The absence of those essential loan modification terms renders the alleged promises insufficiently clear and unambiguous to support a promissory estoppel. (*Laks v. Coast Fed. Sav. & Loan Assn.* (1976) 60 Cal.App.3d 885, 891 ["conditional commitment" to "participate in not more than 75%" of a construction loan was not sufficiently clear to support a promissory estoppel claim, in part because there was no agreement on "payment schedules for each loan, identification of the security, prepayment conditions, terms for interest calculations, loan disbursement procedures, and rights and remedies of the parties in case of default"].)

Appellants maintain the absence of loan modification terms is irrelevant because no loan modification was offered at all, and it is that lack of any offer that is the alleged breach. Assuming appellants alleged a clear promise to offer them a loan modification on *any* terms, they cannot allege reasonable reliance on that promise. " '[W]hether a party's reliance was justified may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts.' " (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239.) " ' "[A] party plaintiff's misguided belief or guileless action in relying on a statement on which no reasonable person would rely is not justifiable reliance," ' " nor is his or her " ' "hopeful expectation[]." ' " (*Granadino v. Wells Fargo Bank, N.A.* (2015) 236 Cal.App.4th 411, 418.)

A borrower might reasonably rely "on a promise to *negotiate* in an attempt to reach a mutually agreeable loan modification." (*Aceves v. U.S. Bank N.A.* (2011) 192 Cal.App.4th 218, 227.) But appellants did not allege any promise to negotiate. They allege a promise of a loan modification, which they now say meant a promise to make a unilateral loan modification offer. No borrower could reasonably rely on such a promise

30

because the offered modification might not lower their monthly payments sufficiently to allow them to avoid default.

We conclude appellants should be granted leave to amend their promissory estoppel claim against BofA, U.S. Bank, and SPS for the same reasons we set forth above in the context of their breach of contract claim.

## *F.* *Negligence*

Appellants allege BofA breached its duty to act reasonably with respect to their loan modification application by (1) failing to accurately account for the documents they submitted, (2) failing to give them a fair loan modification evaluation, and (3) "accepting trial payments from [them] and by not accurately accounting for this or by granting them or denying a modification in a reasonable time period."

"To state a cause of action for negligence, a plaintiff must allege (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, and (3) the breach proximately caused the plaintiff's damages or injuries." (*Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 62 (*Lueras*).) Respondents maintain appellants failed to allege any of these elements.

### *1.* *Duty*

It is often said that, "as a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." (*Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1096 (*Nymark*); *Alvarez v. BAC Home Loans Servicing, L.P.* (2014) 228 Cal.App.4th 941, 945 (*Alvarez*) [following *Nymark*]; *Lueras, supra,* 221 Cal.App.4th at p. 63 [same].) Most of the cases *Nymark* cited for that "general rule" involved actions by third parties against construction lenders. (*Nymark, supra,* at p. 1096, citing *Fox & Carskadon Financial Corp. v. San Francisco Fed. Sav. & Loan Assn.* (1975) 52 Cal.App.3d 484 [construction lender owed no duty of care to plaintiff (investor in borrower's construction project) in making construction loan

31

to borrower]; *Bradler v. Craig* (1969) 274 Cal.App.2d 466 [construction lender owed no duty to purchaser of improved property who was not a party to the loan agreement]; *Connor v. Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850 (*Connor*).)

The "general rule" can be traced back to *Connor*, in which our high court concluded that an institutional construction lender owed a duty to third party buyers of homes financed with its funds to prevent the construction of defective homes because it was "an active participant in [the] home construction enterprise." (*Connor*, *supra*, 69 Cal.2d at p. 864 [lender "had the right to exercise extensive control of the enterprise . . . [and] received not only interest on its construction loans, but also substantial fees for making them, a 20 percent capital gain for 'warehousing' the land, and protection from loss of profits in the event individual home buyers sought permanent financing elsewhere"].) The *Connor* court noted the lender was not in privity of contract with the home buyers. (*Id.* at p. 865.) It concluded a duty nevertheless should be imposed on the lender by applying the so-called *Biakanja* factors. (*Connor*, *supra*, at p. 865.) *Biakanja* "is the leading California case discussing whether a legal duty should be imposed absent privity of contract." (*Giacometti v. Aulla, LLC* (2010) 187 Cal.App.4th 1133, 1137.) In *Biakanja*, the California Supreme Court held that whether the defendant in a specific case "will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors," including: (1) "the extent to which the transaction was intended to affect the plaintiff," (2) "the foreseeability of harm to [the plaintiff]," (3) "the degree of certainty that the plaintiff suffered injury," (4) "the closeness of the connection between the defendant's conduct and the injury suffered," (5) "the moral blame attached to the defendant's conduct," and (6) "the policy of preventing future harm." (*Biakanja*, *supra*, 49 Cal.2d at p. 650.)

In the context of foreclosure litigation, some courts have held that the "general rule" articulated in *Nymark* bars negligence actions by borrowers against lenders acting within the scope of their conventional money-lending role. As is relevant here, some

32

courts have concluded lenders owe no duty of care to borrowers in connection with loan modifications because " 'a loan modification [is] a traditional money lending activity.' " (*Casault v. Federal Nat. Mortg. Ass'n* (C.D. Cal. 2012) 915 F.Supp.2d 1113, 1130; see *Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 207 [advice to borrower "not to make . . . loan payment in order to be considered for a loan modification . . . was directly related to the issue of loan modification and therefore fell within the scope of [bank's] conventional role as a lender of money"].) Those courts did not go on to consider whether the lender might owe a duty based on the *Biakanja* factors. By contrast, other courts have concluded that a lender may owe a duty of care to a borrower based on the *Biakanja* factors, despite the fact that the lender was acting as a conventional lender. (*Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 901 ["[e]ven when the lender is acting as a conventional lender, the no-duty rule is only a general rule"]; accord *Alvarez, supra*, 228 Cal.App.4th at p. 945.)

We agree with the latter line of cases for two reasons. First, the "general rule" was developed in the context of actions by third parties seeking to hold construction lenders liable for borrowers' failings (e.g., construction defects). It would make no sense to impose liability on a lender for such failings unless—unlike a conventional lender—it was actively involved in the borrower's construction project. Second, the cases *Nymark* cited for the "general rule" applied *Biakanja* to determine whether the lender owed a duty of care. (See *Bradler v. Craig, supra*, 274 Cal.App.2d at p. 476; *Fox & Carskadon Financial Corp. v. San Francisco Fed. Sav. & Loan Assn., supra*, 52 Cal.App.3d at p. 489.)

Accordingly, we turn to the *Biakanja* factors to determine whether BofA owed appellants a duty of care with respect to the loan modification application process. The first factor is the extent to which the transaction—the loan modification—was intended to affect appellants. " '[U]nquestionably' " the transaction was intended to affect appellants, as " '[t]he decision on [appellants'] loan modification application would

33

determine whether or not [they] could keep [their] home' " and at what cost. (*Alvarez*, *supra*, 228 Cal.App.4th at p. 948.) Moreover, it was appellants who "specifically brought to [BofA's] attention" their desire for a loan modification. (*Jolley*, *supra*, 213 Cal.App.4th at p. 900.) Respondents correctly note that the transaction also was intended to affect and benefit the lender by maximizing its return. But that does not mean it was not also intended to affect appellants. Rather, it means the transaction was intended to affect appellants, but to a lesser extent than was the case in *Biakanja*, for example, where "the 'end and aim' of the transaction was to provide for the passing of [the decedent's] estate to plaintiff." (*Biakanja*, *supra*, 49 Cal.2d at p. 650.) We conclude the first factor weighs slightly in favor of finding a duty of care.

As to the second factor, potential harm to appellants from mishandling the loan application process was readily foreseeable. Of course, " 'there was no guarantee the modification would be granted had the loan been properly processed.' " (*Alvarez*, *supra*, 228 Cal.App.4th at p. 948.) But the mishandling of appellants' documents and the failure to grant or deny them a modification in a timely fashion kept appellants in a lending limbo where, at BofA's instruction, they paid less than they owed on their loan and fell further into arrears. It was foreseeable that, as a result, appellants' credit rating would be adversely affected, they would forego other opportunities to cure their default, and they would incur increased interest, penalties, and fees. We conclude the second factor weighs in favor of finding a duty of care.

With respect to the third factor, the degree of certainty that appellants suffered injury, respondents argue appellants can show certain injury only if they "would have qualified for or been granted a loan modification but for BofA's allegedly negligent processing of their application." We disagree. Appellants allege they were injured in the form of damage to their credit; foregone remedies; and increased arrears, interest, penalties, and fees by BofA's practice of stringing them along for years regarding the

34

availability of a loan modification. Therefore, we conclude the third factor weighs in favor of finding a duty of care.

The fourth factor is the closeness of the connection between BofA's conduct and appellants' alleged injuries. Some of appellants' alleged injuries—damage to their credit and increased arrears, interest, and penalties—were caused by them defaulting on their loan. Appellants allege, however, that they were current with their loan payments until BofA advised them to become delinquent in mid-2010, suggesting a close connection between BofA's conduct and their default-related injuries. As noted, appellants also allege injury in the form of foregone remedies. Because the connection between that injury and BofA's conduct—stringing appellants along with promises that a loan modification would be forthcoming—is relatively close, the fourth factor weighs in favor of finding a duty of care.

The fifth factor—whether BofA's conduct was blameworthy—is impossible to assess at this stage. (*Jolley*, *supra*, 213 Cal.App.4th at p. 900.) Allegations that BofA encouraged appellants to default suggests BofA bears some amount of fault. But the allegations also indicate appellants needed a loan modification to avoid defaulting, and that that need was not a product of BofA's conduct. (*Lueras*, *supra*, 221 Cal.App.4th at p. 67 ["If the lender did not place the borrower in a position creating a need for a loan modification, then no moral blame would be attached to the lender's conduct."].) Thus, we consider this factor neutral.

Finally, the policy of preventing future harm appears to cut both ways. "Imposing negligence liability may give lenders an incentive to handle loan modification applications in a timely and responsible manner. On the other hand, absent a duty in the first place to modify a loan or even to evaluate such an application under objective standards limiting the lender's discretion, imposing negligence liability for the mishandling of loan modification applications could be a disincentive to lenders from ever offering modification." (*Ottolini v. Bank of America* (N.D.Cal. 2011) 2011 U.S.

35

Dist. Lexis 92900, pp. 18-19, fn. omitted.) In *Alvarez*, the court concluded that the sixth *Biakanja* factor weighed in favor of finding a duty because recent statutory enactments demonstrate the existence of a public policy of preventing future harm to loan borrowers. (*Alvarez*, *supra*, 228 Cal.App.4th at p. 950.) But the question is not whether there is a public policy in favor of preventing future harm to borrowers. Rather, the question is whether imposing a duty would further that policy. For the reasons above, we cannot say whether or not the imposition of a duty would prevent future harm to borrowers.

Because four of the six factors weigh in favor of finding a duty and the other two factors are neutral, we conclude BofA owed appellants a duty of care with respect to the loan modification process.

### 2. *Breach and Causation of Damages*

Appellants sufficiently allege BofA breached its duty of care by failing to accurately account for the documents appellants submitted, failing to fairly evaluate their loan modification application, not accurately accounting for their trial payments, and failing to grant or deny their loan modification applications in a reasonable time period. (See *Alvarez*, *supra*, 228 Cal.App.4th at p. 951 [plaintiffs sufficiently alleged a breach of the duty of care by alleging improper handling of their loan modification applications].) Appellants also sufficiently allege that conduct proximately caused their injuries (e.g., foregone remedies and increased arrears, interest, penalties, and fees). Accordingly, we conclude appellants stated a claim for negligence against BofA.

### 3. *Appellants Should Be Permitted to Amend Their Negligence Claim Against SPS and U.S. Bank*

The negligence claim is directed against SPS and U.S. Bank, in addition to BofA. However, appellants' secondary liability allegations against SPS and U.S. Bank are insufficient. Appellants allege SPS is liable because it "is attempting to enforce" the loan. That conclusory allegation provides no basis for holding SPS liable for BofA's conduct that predated SPS's involvement with appellants' loan. Appellants'

36

supplemental brief advances an assignee liability theory.  As noted above, that theory fails because (1) appellants do not allege BofA assigned anything to SPS and (2) tort liability is not a contractual obligation.  Appellants allege U.S. Bank is liable as BofA's principal.  But the complaint appears to allege BofA undertook much of the alleged negligent conduct before August 2011, when U.S. Bank acquired an interest in the deed of trust and (presumably) BofA became U.S. Bank's agent.  The primary liability theory advanced in appellants' supplemental brief fails for the same reason.  Appellants should be permitted to amend their negligence claim against SPS and U.S. Bank to address these defects for the first time.

### G.    *Wrongful Foreclosure*

"The basic elements of a tort cause of action for wrongful foreclosure track the elements of an equitable cause of action to set aside a foreclosure sale.  They are: '(1) the trustee or mortgagee caused an illegal, fraudulent, or willfully oppressive sale of real property pursuant to a power of sale in a mortgage or deed of trust; (2) the party attacking the sale (usually but not always the trustor or mortgagor) was prejudiced or harmed; and (3) in cases where the trustor or mortgagor challenges the sale, the trustor or mortgagor tendered the amount of the secured indebtedness or was excused from tendering.' " (*Miles v. Deutsche Bank National Trust Co.* (2015) 236 Cal.App.4th 394, 408, quoting *Lona*, *supra*, 202 Cal.App.4th at p. 104.)

In their sixth cause of action, for wrongful foreclosure, appellants allege respondents have no authority to foreclose on their property due to defects in the securitization process.  Specifically, they allege the assignment of the deed of trust to U.S. Bank as trustee for the certificate holders of Harborview Mortgage Loan Trust 2005-08, Mortgage Loan Pass-through Certificates, Series 2005-08 was invalid (or never occurred) because that securitized trust closed prior to the assignment.

In their briefs, appellants conceded that they had not alleged in their complaint that the securitized trust was governed by New York law nor that the interest in their loan was

37

transferred late into the securitized trust. Further, in a supplemental brief, appellants informed us that they have subsequently entered into a loan modification agreement with their new loan servicer. During oral argument, appellants confirmed that their loan had been modified. Presently, there is no threatened foreclosure or prospect of a foreclosure on appellants' home. As a result, appellants conceded during oral argument that, as pleaded, their wrongful foreclosure claim is insufficient, and they would be unable to amend their complaint to state a viable cause of action for wrongful foreclosure. Based on these changed circumstances, we find appellants' concession to be appropriate.[14]

Appellants, however, raised for the first time during oral argument that they should be given the opportunity to amend their complaint to state a cause of action for declaratory relief based on the same facts. They claim that they would also be able to allege in good faith, based on information and belief, that New York law governs the securitized trust and that their loan was not transferred to the securitized trust within 90 days of the closing date.

This alternative theory was not raised by appellants below or in any of their briefs before this court on appeal. "We will not consider an issue not mentioned in the briefs and raised for the first time at oral argument." (*BFGC Architects Planners, Inc. v. Forcum/Mackey Construction, Inc.* (2004) 119 Cal.App.4th 848, 854.) Although "the showing as to how the complaint may be amended need not be made to the trial court and can be made for the first time to the reviewing court [citation], [appellants'] argument raised for the first time at oral argument, is not adequate to justify our finding the trial court abused its discretion." (*New Plumbing Contractors, Inc. v. Nationwide Mutual Ins. Co.* (1992) 7 Cal.App.4th 1088, 1098.) Additionally, appellants have not provided us

---

[14] In view of the current posture of this case, both sides have agreed that the California Supreme Court's recent decision in *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919 is inapplicable here.

with any authority that would show that a declaratory relief claim would be viable nor have they explained precisely how the allegations in support of the claim of wrongful foreclosure would apply to a claim for declaratory relief.

"In deciding whether the trial court abused its discretion in denying leave to amend, 'we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment. [Citation.] If we find that an amendment could cure the defect, we conclude that the trial court abused its discretion and we reverse; if not, no abuse of discretion has occurred. [Citation.] The plaintiff has the burden of proving that an amendment would cure the defect.' " (*Fontenot v*. *Wells Fargo Bank*, *N.A.* (2011) 198 Cal.App.4th 256, 274.) We find no abuse of discretion here. Appellants have failed to demonstrate that they could cure the defects with an amendment.

### *H*. *UCL*

"The UCL prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.' " (*Kwikset Corp*. *v*. *Superior Court*, *supra*, 51 Cal.4th at p. 320.) "A plaintiff may pursue a UCL action in order to obtain either (1) *injunctive relief*, 'the primary form of relief available under the UCL,' or (2) *restitution* ' "as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." ' " (*Jenkins*, *supra*, 216 Cal.App.4th at p. 520.)

Appellants' seventh cause of action alleges respondents violated the UCL by (1) violating the nonjudicial foreclosure statute (Civ. Code, § 2924); (2) violating Penal Code section 115.5, which prohibits the recording of false or forged documents; (3) negligently handling appellants' loan modification applications, and (4) making "material misrepresentations affecting [appellants'] interest in" the property. Appellants allege these practices violated all three prongs of the UCL.

39

### 1. *Appellants Failed to State a UCL Claim*

To the extent appellants' UCL cause of action is predicated on an alleged violation of Civil Code section 2924, it fails because we have held appellants failed to state a claim for wrongful foreclosure. Appellants' UCL claim also fails to the extent it is based on an alleged violation of Penal Code section 115.5, as appellants allege no facts supporting their conclusory allegation that respondents violated that statute. All that remains, then, is a UCL cause of action predicated on BofA's wrongful conduct in connection with appellants' loan modification applications (e.g., negligence and misrepresentations).

Respondents contend appellants' UCL claim fails because appellants do not allege facts entitling them to either restitution or injunctive relief, which are the only remedies the UCL affords private plaintiffs. (See *Madrid v. Perot Systems Corp.* (2005) 130 Cal.App.4th 440, 452.) Appellants respond that they pleaded a viable UCL restitution claim by alleging they "were forced to pay unwarranted fees and penalties which they would not have incurred had Respondents' not behaved the way they did."

" '[I]n the UCL context . . . restitution means the return of money to those persons from whom it was taken or who had an ownership interest in it.' " (*Feitelberg v. Credit Suisse First Boston, LLC* (2005) 134 Cal.App.4th 997, 1013.) The "notion of restoring something to a victim of unfair competition includes two separate components. The offending party must have obtained something to which it was not entitled *and* the victim must have given up something which he or she was entitled to keep." (*Day v. AT&T Corp.* (1998) 63 Cal.App.4th 325, 340.) Even assuming appellants were entitled to keep the money they paid in the form of penalties and fees, they do not allege BofA obtained those payments. Thus, the first amended complaint failed to allege a viable UCL restitution claim against BofA.

Appellants' UCL claim also is directed against U.S. Bank, SPS, and ReconTrust, apparently based on BofA's conduct, although the complaint does not allege how U.S. Bank, SPS, and ReconTrust are secondarily liable for BofA's alleged UCL violations.

40

In any event, appellants' UCL claims against U.S. Bank, SPS, and ReconTrust fail because there can be no secondary liability without any underlying, primary liability.

### 2. *Appellants Should Be Granted Leave to Amend Their UCL Claim*

We conclude the trial court erred by denying appellants leave to amend their UCL claim. The first amended complaint does not show on its face that appellants cannot allege that BofA obtained something to which it was not entitled or is otherwise defective and appellants have not had the opportunity to cure that defect. (*McDonald*, *supra*, 180 Cal.App.3d at pp. 303-304.) With respect to U.S. Bank, SPS, and ReconTrust, respondents contend there can be no vicarious liability for UCL violations. Appellants respond by noting they "specifically plead[ed] that Bank of America and U.S. Bank conspired to defraud Appellants in the loan modification process." Some cases indicate there can be secondary liability for UCL violations. For example, in *People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1242, the court held that "persons *can* be found liable for misleading advertising and unfair business practices under normal agency theory." (Italics added.) In *People v. Bestline Products, Inc.* (1976) 61 Cal.App.3d 879, 918-919, the court held that those who actively participated in a conspiracy to defraud by disseminating misrepresentations could be held liable under the UCL. In view of that authority, we conclude appellants also should be permitted to amend their UCL claims against U.S. Bank, SPS, and ReconTrust.

## III. DISPOSITION

The judgments are reversed and the matter is remanded to the superior court with directions to vacate its orders sustaining Select Portfolio Servicing, Inc., and U.S. Bank National Association's demurrer without leave to amend and granting Bank of America and ReconTrust Company, N.A.'s motion for judgment on the pleadings without leave to amend. The superior court is further directed to enter a new order (1) denying the motion for judgment on the pleadings as to the intentional and negligent misrepresentation causes of action against Bank of America; (2) sustaining the demurrer as to the intentional and

negligent misrepresentation causes of action against Select Portfolio Servicing, with leave to amend; (3) overruling the demurrer as to the intentional and negligent misrepresentation causes of action against U.S. Bank National Association; (4) sustaining the demurrer and granting the motion for judgment on the pleadings as to the cause of action for breach of contract, with leave to amend; (5) sustaining the demurrer and granting the motion for judgment on the pleadings as to the cause of action for promissory estoppel, with leave to amend; (6) denying the motion for judgment on the pleadings as to the negligence cause of action against Bank of America; (7) sustaining the demurrer as to the negligence of action against Select Portfolio Servicing and U.S. Bank, with leave to amend; (8) sustaining the demurrer and granting the motion for judgment on the pleadings as to the cause of action for wrongful foreclosure, without leave to amend; (9) sustaining the demurrer and granting the motion for judgment on the pleadings as to the cause of action for civil conspiracy, without leave to amend ; and (10) sustaining the demurrer and granting the motion for judgment on the pleadings as to the cause of action for violation of the UCL (Bus. & Prof. Code, § 17200 et seq.), with leave to amend.  The parties shall bear their own costs on appeal.

_____
                          Walsh, J.[*]


        WE CONCUR:



_____
        Rushing, P.J.



_____
        Elia, J.



Daniels et al. v. Select Portfolio, Inc., et al.
H040487
Daniels et al. v. Bank of America, N.A. et al.
H040990
_____
        [*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial Court: | Santa Cruz County Superior Court<br>Superior Court No. CV176513 |
| Trial Judge: | Hon. Rebecca Connolly |
| Counsel for Plaintiffs/Appellants:<br>Julia and Andre Daniels | United Law Center<br>Danny A. Barak<br>Stephen J. Foondos |
| Counsel for Defendants/Respondents:<br>Select Portfolio Servicing, Inc.<br>U.S. Bank, N.A.<br><br>**H040487** | Locke Lord<br>Regina J. McClendon |

| | |
|---|---|
| Trial Court: | Santa Cruz County Superior Court<br>Superior Court No. CV176513 |
| Trial Judge: | Hon. Rebecca Connolly |
| Counsel for Plaintiffs/Appellants:<br>Julia and Andre Daniels | United Law Center<br>Danny A. Barak<br>Stephen J. Foondos |
| Counsel for Defendants/Respondents:<br>Bank of America, N.A.<br>ReconTrust Company, N.A.<br><br>**H040990** | Severson & Werson<br>Jan T. Chilton<br>Jon D. Ives |

Daniels et al. v. Select Portfolio, Inc., et al.
H040487
Daniels et al. v. Bank of America, N.A. et al.
H040990